OBERLIN ET AL., APPELLANTS, *v.* AKRON GENERAL MEDICAL CENTER; NORTH HILL ORTHOPAEDICS, INC. ET AL., APPELLEES.

[Cite as *Oberlin v. Akron Gen. Med. Ctr.* (2001), 91 Ohio St.3d 169.]

(No. 99–1876—Submitted September 13, 2000—Decided March 28, 2001.)

PFEIFER, J.    In December 1994, appellee Gregory Hill, D.O., performed a thumb joint fusion and bone graft procedure on appellant Robert C. Oberlin at Akron General Medical Center.   In surgery, Hill used a pneumatic tourniquet with the assistance of a nurse.   Hill dictated the tourniquet use, including its inflation pressure and the duration of the inflation.   At Hill's direction, the tourniquet remained inflated for two hours and twenty-four minutes.

Oberlin claimed that he suffered permanent damage to his left arm, hand, and ulnar nerve due to Hill's negligence.   According to expert testimony presented on Oberlin's behalf, the length of the inflation time was excessive, resulting in permanent injury to Oberlin, namely, reflex sympathetic dystrophy.

Gregory Vrabec, M.D., testified as an expert for Hill. In his discovery deposition of May 28, 1997, Vrabec admitted to being a defendant in a pending medical malpractice action.   When asked of the nature of the injury in that case, Vrabec responded, "Interestingly, it is ulnar nerve following an ulnar nerve transposition of the elbow."   However, Vrabec claimed no knowledge of the details of the claim, including the plaintiff's theory of negligence.

In a video deposition of June 13, 1997, Oberlin's counsel again cross-examined Vrabec as to the claim against him.   The claim had been brought in Canada by Vrabec's former patient, Donna Kampen, and involved an injury similar to Oberlin's.   Kampen's claim arose out of orthopaedic surgery on her left arm, and her injury was to her left ulnar nerve, causing causalgia, also known as reflex sympathetic dystrophy.

.  When the video deposition was played at trial, the court refused to allow the jury to view Oberlin's cross-examination of Vrabec concerning the Canadian malpractice case.   The trial court found that although the testimony "may have some probative value in terms of bias, * * * the Court feels that the prejudicial nature of this testimony far outweighs any probative value."   Upon review of the transcript of the June 13, 1997 deposition, the trial judge noted:

"And all I can tell from reading this transcript, the only thing that the doctor agrees upon, that it involved orthopaedic surgery treatment on her left hand.
" * * *

"I can't tell from reading this whether or not [the Canadian] litigation * * * involved a tourniquet or if there was a problem with the anesthesia or all of those that are present in our case.   I can't tell."

On appeal, Oberlin attempted to demonstrate the probative value of the disallowed testimony, arguing that the evidence would have established potential bias on Vrabec's part because he was facing a very similar malpractice claim himself.

In his brief to the appellate court, Oberlin attached Vrabec's deposition in his own malpractice case taken in Canada on July 26, 1996. That deposition, however, had not been made available to the trial judge. The appellate court held that because Oberlin had failed to demonstrate that the probative value of the evidence at issue was not substantially outweighed by the danger of unfair prejudice, the evidence was inadmissible pursuant to Evid.R. 403(A).

The cause is now before this court upon the allowance of a discretionary appeal.

We hold that evidence that an expert witness is a defendant in a pending malpractice action alleging a medical error similar to the one at issue is probative and is admissible to prove bias, prejudice, or motive to misrepresent.

Evid.R. 611(B) states that "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility."

Evid.R. 616(A) addresses certain acceptable methods of impeaching witnesses:

"(A) Bias. Bias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence."

Thus, Evid.R. 611 and 616, by specifically mentioning credibility, bias, and prejudice as appropriate subjects of cross-examination, are a testament to the inherent probative value of such evidence. Evid.R. 403 seeks to eliminate the potential for prejudice of certain evidence by prohibiting its use in certain circumstances. The rule reads:

"(A) Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

The rule requires that the unfair prejudice *substantially* outweigh the probative value of the evidence. Evid.R. 611(B) and Evid.R. 616 establish that cross-examination evidence relating to lack of credibility and bias has probative weight. The first question, then, is whether the evidence at issue in this case could show bias. The trial judge claimed to know little of the specifics of the claim against Vrabec—"the only thing that the doctor agrees upon, that it involved orthopaedic surgery treatment on her left hand."

The similarity of the area operated upon and of the resulting injury is enough to indicate bias. If Vrabec were to criticize any aspect of Hill's handling of the surgery, the Canadian plaintiff might seize on that testimony and use it against Vrabec in her own suit. Therefore, Vrabec might be biased in evaluating Hill's performance for fear that the testimony might be used against him later. He might be predisposed to find that the doctor here acted within acceptable bounds of competence.

Second, an expert with an active malpractice case against him might be hostile to malpractice claimants in general. He might apply what he considers the unfairness of the entire process to his interpretation of whether this particular doctor acted reasonably.

The probative value of Vrabec's testimony is unquestionable. The ultimate question becomes one, then, of whether there is unfair prejudice in allowing questioning on a witness's own malpractice claim. We look to other decisions of this court where potential prejudice was an issue. In *Beck v. Cianchetti* (1982), 1 Ohio St.3d 231, 236, 1 OBR 253, 257, 439 N.E.2d 417, 421, this court held that Evid.R. 411 "allows admission of evidence of liability insurance when offered to prove bias or prejudice of a witness." In *Beck*, the cross-examination of the witness would have revealed that the defendant in a negligence action had liability insurance, a fact that is not admissible to prove negligence. However, this court held that the evidence was admissible because it was offered to prove the witness's motive to misrepresent.

More recently, in *Ede v. Atrium S. OB–GYN, Inc.* (1994), 71 Ohio St.3d 124, 642 N.E.2d 365, syllabus, this court held that "evidence of a commonality of insurance interests between a defendant and an expert witness is sufficiently probative of the expert's bias as to clearly outweigh any potential prejudice [that] evidence of insurance might cause." Again, in *Ede*, the testimony sought on cross-examination issue would have revealed the existence of the defendant's insurance coverage. And again, this court found that the probative value of the evidence outweighed any potential prejudice.

In those cases, the cross-examination of the witness also revealed information about the defendant. Here, there was no such danger of an evidentiary ricochet. Vrabec would have been testifying only about his own malpractice case. The evidence would have no reflection on Hill.

As in *Ede*, 71 Ohio St.3d 124, 642 N.E.2d 365, the trial judge in this case gave undue weight to any prejudice that might occur. The fact that evidence of a pending malpractice might affect how a jury views testimony of an expert does not of itself create unfair prejudice:

"Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word 'unfair.' Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect." Weissenberger's Ohio Evidence (2000) 85–87, Section 403.3.

Of course, evidence of an expert witness's potential bias will prejudice the case of the party for whom he is testifying. But that is the very reason for establishing the bias of a witness—to cause a jury to think critically about the testimony being offered. The only important inquiry is whether the evidence of bias is *unfairly* prejudicial. Were Oberlin's counsel in this case to attempt to inflame jurors by describing the horrors of the Canadian plaintiff's injury, that might be considered unfairly prejudicial. The fact the expert is simply involved in a pending malpractice action is not.

Thus, the trial court in this case unreasonably minimized the probative value of cross-examination of Vrabec on his pending malpractice claim, and accorded far too much weight to the allegedly unfair prejudicial nature of that testimony. The trial judge thus abused her discretion in refusing to allow Oberlin to cross-examine Vrabec on his pending malpractice action. We accordingly reverse the judgment of the appellate court, and order a new trial in this matter.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

COOK and LUNDBERG STRATTON, JJ., dissent.

---

COOK, J., dissenting. Today's majority decision addresses the exclusion of evidence. It is well settled that "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. This court has specifically held that "[t]he scope of cross-examination of a medical expert on the questions of the expert's bias and pecuniary interest and the admissibility of evidence relating thereto are matters that rest in the sound discretion of the trial court." *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 24 O.O.3d 322, 436 N.E.2d 1008, syllabus (applying abuse-of-discretion standard to Evid.R. 403[B] determination). Therefore, an appellate court may only overturn a trial court's evidentiary ruling if that ruling was unreasonable, arbitrary, or unconscionable. *Id.* at 219–220, 24 O.O.3d at 323, 436 N.E.2d at 1010. See, also, *State v. Allen* (1995), 73 Ohio St.3d 626, 632–633, 653 N.E.2d 675, 683 (abuse-of-discretion standard applies to both Evid.R. 403[A] and [B] determinations). The majority opinion, however, does not accord the abuse-of-discretion standard proper consideration.

While relevant evidence is presumed admissible under Evid.R. 402, the rules also provide for a determination of admissibility based upon whether the proba-

tive value of the evidence sought to be admitted "is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). In this case, the trial judge expressly found that the plaintiffs-appellants had failed to make a sufficient showing to enable the judge to say that the probative value of the evidence outweighed its prejudicial impact. Given the paucity of information before the trial court, I cannot say that the judge's decision was unreasonable, arbitrary, or unconscionable. Though I might have ruled differently from the trial court, such conjecture is beside the point. See *Calderon*, 70 Ohio St.2d at 222, 24 O.O.3d at 325, 436 N.E.2d at 1012 ("It is important to remember that the question before this court is not whether the trial court ruled as we would have ruled if confronted with these questions, but whether the court abused its discretion so as to prejudice [the complaining party]").

Accordingly, I respectfully dissent.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

———————

*A. William Zavarello Co., L.P.A., A. William Zavarello* and *Rhonda Gail Davis,* for appellants.

*Mazanec, Raskin & Ryder* and *John L. Cullen,* for appellees.

*Mark W. Ruf,* urging reversal for *amicus curiae,* Ohio Academy of Trial Lawyers.

MIDWEST FIREWORKS MANUFACTURING COMPANY, INC., APPELLEE,
*v.* DEERFIELD TOWNSHIP BOARD OF ZONING APPEALS ET AL.;
CARVER, APPELLANT.

[Cite as *Midwest Fireworks Mfg. Co. v. Deerfield Twp. Bd. of Zoning Appeals* (2001), 91 Ohio St.3d 174.]

(No. 00–196—Submitted November 15, 2000—Decided March 28, 2001.)

LUNDBERG STRATTON, J.   R.C. 519.15 allows "any person aggrieved" by an administrative officer's zoning decision to appeal to the township board of zoning appeals.   This case asks whether the property owner herein has standing as a "person aggrieved" by a zoning decision allowing the construction of a building on neighboring property.   For the reasons set forth below, we hold that appellant, Jesse J. Carver, Jr., is a "person aggrieved" and, therefore, has standing to appeal the decision to the township board of zoning appeals.

I

Appellee, Midwest Fireworks Manufacturing Company, Inc. ("Midwest"), operates a fireworks factory on approximately eighty-six acres of land in Deerfield Township, Portage County.   Midwest and its predecessors have occupied this property since the early 1970s, before any township zoning regulations were in place.   Prior to 1980, the Deerfield Township Board of Trustees enacted the Deerfield Zoning Regulations ("DZR"), which zoned Midwest's land as a residential district.   Midwest continued its fireworks operation as a valid, nonconforming use.   See R.C. 519.19.

In 1982, an explosion and fire destroyed two buildings and several trailers on Midwest's property.   The fire injured four persons and caused an estimated $1 million in damages.   Although Midwest continued its fireworks business and constructed buildings on other parts of its land, it did not reconstruct the buildings destroyed in 1982.

Fifteen years later, in 1997, Midwest and Pacific Financial Services, Inc., the record owner of the property on which Midwest is situated, applied for a zoning certificate that would allow Midwest to construct a single building to replace the two buildings that had burned down in the 1982 fire.   The application stated that the proposed building would be seven thousand two hundred square feet. Attached to the application was an affidavit from Larry Lomaz, who controlled Midwest and Pacific Financial Services.   According to Lomaz, the proposed building was approximately the same size as the two buildings destroyed in 1982. Lomaz also claimed that Midwest had not rebuilt the destroyed buildings before 1997 due to several years of litigation involving it and Deerfield Township.   A Deerfield Township zoning inspector granted the zoning certificate nine days after Lomaz submitted the application.

Appellant, Jesse J. Carver, Jr., owns and lives on property directly across a two-lane highway from Midwest's property. He was living there when the fire occurred at Midwest in 1982. Carver appealed the issuance of the zoning certificate to the Deerfield Township Board of Zoning Appeals ("BZA"). He argued to the BZA that Midwest had abandoned its nonconforming use privileges by failing to rebuild the destroyed buildings within two years. He testified that he had regularly viewed Midwest's property and had not observed, since the 1982 fire, any activity related to Midwest's fireworks business on the site of the proposed building. Carver also presented evidence to the BZA that the two buildings destroyed in 1982 were of a combined 1,536 square feet—considerably smaller than the seven-thousand-two-hundred square-foot structure that Midwest proposed to build.

The BZA conducted hearings on February 11 and 21, 1998. Carver appeared with counsel at both hearings and testified at the second one. Lomaz attended on behalf of Midwest the February 11 hearing only. The BZA confined its inquiry to two issues: whether this was a nonconforming use, and the size of the proposed building. Following the two hearings, the BZA ruled in Carver's favor and revoked Midwest's zoning certificate.

Midwest filed an R.C. 2506.01 administrative appeal with the Portage County Court of Common Pleas. The company argued, among other things, that Carver lacked standing to appeal to the BZA because he was not a "person aggrieved" by the zoning inspector's issuance of a zoning certificate. The trial court disagreed:

"Carver's property and residence is located directly across the road from [Midwest's] property. Only a two lane roadway separates the two properties. From his property Carver can see the site where the proposed new building was to be built. The former buildings had exploded and burned in 1982, creating a legitimate concern for the safety of his own property. It was Carver's position that issuance of the zoning permit was unlawful. From all the circumstances presented in the transcript to proceedings, it can be concluded that Carver was a 'person aggrieved' of [Midwest's] receipt of a zoning permit and had standing to appeal to the Board from the zoning inspector's decision to issue that zoning permit."

The trial court also rejected Midwest's remaining arguments and affirmed the BZA's decision to revoke the zoning certificate. The Eleventh District Court of Appeals reversed and entered judgment in favor of Midwest. The court of appeals concluded that Carver made "no showing that allowing Midwest to build one more building on property that already contained multiple buildings would affect Mr. Carver's personal, pecuniary or property rights." Absent such a showing, Carver was not a "person aggrieved" by the zoning inspector's issuance of the zoning certificate. The court concluded that Carver lacked standing to

appeal to the BZA and, consequently, the BZA lacked authority to revoke the zoning certificate issued to Midwest.

This cause is now before this court upon the allowance of a discretionary appeal.

## II

The sole issue before us is whether Carver had standing to challenge the issuance of Midwest's zoning certificate by bringing an appeal to the BZA. The right to appeal an administrative decision is neither inherent nor inalienable; to the contrary, it must be conferred by statute. See *Roper v. Richfield Twp. Bd. of Zoning Appeals* (1962), 173 Ohio St. 168, 173, 18 O.O.2d 437, 440, 180 N.E.2d 591, 594. Carver claims a statutory right to appeal under R.C. 519.15 and DZR 701.52, both of which allow "any person aggrieved * * * by any decision of the administrative officer" to appeal that decision to the BZA. Therefore, whether Carver had standing to bring an appeal before the BZA depends upon whether he was a "person aggrieved" by the zoning inspector's issuance of a zoning certificate to Midwest.

In *Ohio Contract Carriers Assn., Inc. v. Pub. Util. Comm.* (1942), 140 Ohio St. 160, 23 O.O. 369, 42 N.E.2d 758, this court held: "Appeal lies only on behalf of a party aggrieved by the final order appealed from." *Id.* at syllabus. An "aggrieved" party is one whose interest in the subject matter of the litigation is " 'immediate and pecuniary, and not a remote consequence of the judgment.' " *Id.* at 161, 23 O.O. at 369, 42 N.E.2d at 759, quoting 2 American Jurisprudence (1936) 942, Appeal and Error, Section 50. Thus, in order to have standing to appeal, a person must be "able to demonstrate a present interest in the subject matter of the litigation which has been prejudiced" by the judgment appealed from. *Willoughby Hills v. C.C. Bar's Sahara, Inc.* (1992), 64 Ohio St.3d 24, 26, 591 N.E.2d 1203, 1205. See, also, Black's Law Dictionary (7 Ed.1999) 1144 (defining "aggrieved party" as one whose "personal, pecuniary, or property rights have been adversely affected by another person's actions or by a court's decree or judgment"). A future, contingent, or speculative interest is not sufficient to confer standing to appeal. *Ohio Contract Carriers*, 140 Ohio St. at 161, 23 O.O. at 369, 42 N.E.2d at 759.

The question of Carver's standing to appeal the issuance of the zoning certificate did not become an issue until Midwest's appeal to the common pleas court. To initiate the appeals process, Carver had completed a preprinted form entitled "Deerfield Township Application for Appeal." The form instructs the appealing party to describe the "error" allegedly made by the zoning inspector. It does not require the person to explain or give reasons why the person is

entitled to appeal the decision. At the hearings, the BZA expressly limited its inquiry by proceeding under the assumption that Carver had standing. Therefore, the record before the BZA on the issue is sparse at best.

In its appeal to the common pleas court, Midwest argued that Carver was not a "person aggrieved" and, therefore, the BZA lacked jurisdiction to consider the administrative appeal. We agree with the trial court that the facts adduced before the BZA support a conclusion to the contrary. The record establishes that Carver sufficiently satisfied the term "person aggrieved" within the meaning of R.C. 519.15.

Carver is a taxpayer and property owner who lives immediately adjacent to the fireworks factory, separated only by a two-lane road. In 1982, two buildings on the fireworks property exploded and burned, causing injuries to four persons. The company plans to replace the two destroyed buildings with one structure that would be nearly five times the combined size of the two former buildings. The fact that Midwest's property already contains multiple buildings does not diminish the impact of yet another building with a proposed size of seven thousand two hundred square feet. To an adjacent property owner, construction of an additional, larger building may be an immediate concern under certain circumstances. Carver's position is unique as compared to others within the general community who do not live across the street from the fireworks factory.

Carver's position is further buttressed by this court's opinion in *Roper v. Bd. of Zoning Appeals,* 173 Ohio St. 168, 18 O.O.2d 437, 180 N.E.2d 591. In *Roper,* this court decided whether a particular property owner had standing to appeal a board of zoning appeals' issuance of a variance to another property owner in the township. Although the opinion does not state whether Roper's property was neighboring or adjacent to the rezoned property, Roper commenced an administrative appeal to the common pleas court that was ultimately dismissed for lack of standing. This court reversed the dismissal and held that Roper had standing to bring an administrative appeal because he (1) was a resident, elector, and property owner of the township, (2) appeared before a township board of zoning appeals with an attorney to protest a zoning change, and (3) stated his intention on the record to appeal the board's decision to the common pleas court. *Id.* at syllabus. See, also, *Schomaeker v. First Natl. Bank of Ottawa* (1981), 66 Ohio St.2d 304, 20 O.O.3d 285, 421 N.E.2d 530. Schomaeker was an adjacent property owner who was "directly affected" by the grant of a zoning variance to property contiguous to her and who had previously challenged the proposed use. Therefore, she was within the "class of persons * * * entitled to appeal." *Id.* at paragraph two of the syllabus.

Here, there were no public hearings where Carver could voice his concerns before the zoning inspector unilaterally issued the permit to Midwest. Yet,

within twenty days of issuance of the zoning certificate, Carver made his opposition known when he appealed to the BZA. He personally attended the public hearing held by the BZA and was represented by counsel. Carver's lack of participation prior to the initial zoning decision (where he had no opportunity to object) does not diminish his concerns for safety due to his proximity to the construction of yet another larger building on Midwest's property.

Midwest argues that fear of a future explosion is a speculative or remote consequence. Had there never been an explosion or fire on the property, this argument may be more persuasive. Indeed, we find that the opposite is true. With the manufacture of fireworks, requiring the use and handling of explosive materials, the risk of catastrophic explosion exists at all times. In addition, fireworks explosions have the potential to propel ignited materials directly onto Carver's property, thereby spreading the risk of fire. This creates a real and serious threat to persons or property. The fact that an explosion has occurred in the past only augments a neighboring property owner's concern about the operation.

Consequently, we hold that, under the facts of this case, Carver is a "person aggrieved" within the meaning of R.C. 519.15 and, therefore, he has standing to appeal the decision of Deerfield Township granting a zoning certificate to Midwest Fireworks. The judgment of the court of appeals is reversed, and the cause is remanded to the court of appeals to consider the case on its merits.

*Judgment reversed*
*and cause remanded.*

MOYER, C.J., DOUGLAS and RESNICK, JJ., concur.

F.E. SWEENEY, PFEIFER and COOK, JJ., dissent.

---

**COOK, J., dissenting.** This case asks whether a property owner is a "person aggrieved" by a zoning decision absent a showing by the property owner of a present and substantial interest in the decision beyond a desire to see zoning regulations properly enforced. Because an immediate personal or pecuniary injury is an indispensable element of standing, I respectfully dissent.

Carver claims a statutory right to appeal under R.C. 519.15 and Deerfield Zoning Regulation 701.52, both of which allow "any person aggrieved * * * by any decision of the administrative officer" to appeal that decision to the Board of Zoning Appeals ("BZA"). To be "aggrieved" for purposes of appellate standing, a person must have a *present* and *substantial* interest in the challenged action (in this case, the issuance of the zoning certificate). For a private litigant in a zoning appeal, a present and substantial interest consists of harm that is unique to that

party. *Willoughby Hills v. C.C. Bar's Sahara, Inc.* (1992), 64 Ohio St.3d 24, 27, 591 N.E.2d 1203, 1205–1206. A future, contingent, or speculative interest will not suffice. *Ohio Contract Carriers Assn., Inc. v. Pub. Util. Comm.* (1942), 140 Ohio St. 160, 161, 23 O.O. 369, 42 N.E.2d 758, 759.

The majority concludes that Carver is uniquely harmed by the issuance of the building permit in view of the fact that Midwest's fireworks facilities exploded in 1982 and could explode again, posing a serious threat to Carver's personal and proprietary interests. But Carver alleged no personal or pecuniary injury when he filed his BZA appeal. He simply alleged that Midwest's proposed structure was larger than the buildings it was supposed to replace and that the zoning inspector did not make a "reasonable effort to determine" whether the building was a proper nonconforming use. Similarly, in his brief to this court, Carver describes his harm as the "blatantly wrongful issuance" of a zoning certificate that allows Midwest to "expand" its commercial fireworks operation in a residential zone. Carver maintains that he has a right "to expect and to demand" enforcement of the township zoning regulations, which exist for his family's health, safety, and welfare.

The common thread in Carver's allegations of harm is that they have less to do with his personal or proprietary interests than they do with ensuring Midwest's compliance with duly enacted zoning regulations. But enforcement of zoning laws is a concern shared by other citizens of the township at large. Carver's asserted interest is therefore akin to a generalized grievance shared equally by other members of the public. And such harm normally will not confer standing to appeal. *Am. Aggregates Corp. v. Columbus* (1990), 66 Ohio App.3d 318, 323, 584 N.E.2d 26, 29, citing *Warth v. Seldin* (1975), 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354.

I also disagree with the majority's view that Carver's asserted harm is "unique" to him in light of his status as an owner of property across the road from Midwest's. Neither Carver nor the majority has explained how Carver's personal, pecuniary, or property rights would be adversely affected by Midwest's construction of one more building on a parcel that already contains multiple buildings devoted to Midwest's commercial fireworks business. Nevertheless, the majority concludes that there is a "real and serious threat" to Carver's property because the manufacture of fireworks carries "the risk of catastrophic explosion * * * at all times." But these fears of future explosion are speculative at best and based on little more than the assumption, without support in the record, that Midwest is generally vulnerable to explosions and fires regardless of how safely it engages in its business. Even if Carver has a general fear for life and limb because of Midwest's activities, he cannot use an intangible possibility of *future* injury as a springboard to R.C. 519.15 review. Standing exists only if the

appealing party can show a present interest in the matter appealed, not simply a concern of future injury that may or may not occur. Cf. *In re Petition for Incorp. of Holiday City* (1994), 70 Ohio St.3d 365, 371, 639 N.E.2d 42, 47 (arguments concerning what injuries *may* occur in event of incorporation were "speculative at best and fail to expose a present interest in the matters at issue").

Moreover, the majority inexplicably overlooks a fact that undermines its finding of immediate harm based on a perceived fear of future explosion. Midwest's application for a zoning certificate expressly stated that the proposed building would be used as *garage storage for company vehicles* and not for fireworks manufacturing or storage. Although the majority emphasizes the "risk of catastrophic explosion" related to fireworks manufacturing, the zoning application on its face suggests a significantly diminished threat of this type of harm.

To buttress its conclusion, the majority cites *Roper v. Richfield Twp. Bd. of Zoning Appeals* (1962), 173 Ohio St. 168, 18 O.O.2d 437, 180 N.E.2d 591, and *Schomaeker v. First Natl. Bank of Ottawa* (1981), 66 Ohio St.2d 304, 20 O.O.3d 285, 421 N.E.2d 530, to support a finding that Carver has standing to bring an R.C. 519.15 appeal. Carver relies on both of these cases to support the proposition that he would have standing, as a neighboring property owner, if this were an R.C. 2506.01 appeal and that he should therefore have standing under R.C. 519.15. But these cases provide weak support for this conclusion. Neither *Roper* nor *Schomaeker* suggests that mere adjacency of one's property is enough to confer standing to bring an administrative zoning appeal. When read together, these cases clarify that harm unique to the complaining party provides the basis upon which a private property owner, as distinguished from the public at large, can challenge a zoning decision in an administrative appeal. See *Willoughby Hills*, 64 Ohio St.3d at 27, 591 N.E.2d at 1205–1206. An adjacent or neighboring property owner *may* have standing to bring an appeal under R.C. 519.15 *if* that owner demonstrates the immediate personal or pecuniary injury required to be a "person aggrieved" within the meaning of the statute. Carver has not demonstrated unique harm in this case and thus cannot rely on *Roper* and *Schomaeker* to support his argument for standing.

Absent sufficient allegations of a present and substantial interest in the litigation that is unique compared to that shared by the public at large, Carver has not established that he has standing to appeal to the BZA under R.C. 519.15. I would therefore affirm the judgment of the court of appeals.

F.E. SWEENEY and PFEIFER, JJ., concur in the foregoing dissenting opinion.

---

*Cole Co., L.P.A.,* and *Mark H. Ludwig,* for appellee.

*Craig T. Conley,* for appellant.

STEVENS, APPELLANT, *v.* ACKMAN ET AL.; CITY OF MIDDLETOWN, APPELLEE.

[Cite as *Stevens v. Ackman* (2001), 91 Ohio St.3d 182.]

(Nos. 00–225 and 00–513—Submitted November 29, 2000—Decided March 28, 2001.)

ALICE ROBIE RESNICK, J.

I

Facts and Procedural History

On December 16, 1994, seventeen-year-old Corey C. Banks died in an automobile accident on Roosevelt Avenue (also called Roosevelt Road) in Middletown, Ohio. Banks was a passenger in an automobile operated by Emily J. Duff, now known as Emily J. Ackman, a classmate of his at Middletown High School. Duff's vehicle went left of center in a heavy rain and collided with an oncoming vehicle. When police arrived at the scene, Banks was dead.

On December 13, 1996, plaintiff-appellant Shira Sue Stevens (the mother of Banks and the administrator of his estate) filed a complaint against Ackman and appellee, the city of Middletown, in the Butler County Court of Common Pleas, alleging that they were responsible for the wrongful death of Banks. Stevens asserted that Middletown was liable for Banks's death for its failure to properly maintain Roosevelt Road, including allowing an unsafe pavement edge drop to exist on the side of the road, which caused Ackman to lose control of her vehicle when she attempted to return it to the roadway after it had dropped off the pavement edge. Stevens alleged that Middletown breached its duty to maintain Roosevelt Road open, in repair, and free from nuisance, and that the roadway was unsafe.

Middletown moved for summary judgment pursuant to R.C. Chapter 2744, the Political Subdivision Tort Liability Act, claiming that it was entitled to statutory immunity and that Stevens was unable to prevail against it as a matter of law. Middletown argued that the exception to political subdivision immunity found in R.C. 2744.02(B)(3) ("political subdivisions are liable for injury, death, or loss to persons or property caused by their failure to keep public roads * * * open, in repair, and free from nuisance") was not applicable in the circumstances of this case to defeat its immunity.

The trial court denied the motion for summary judgment, relying on this court's decisions in *Dickerhoof v. Canton* (1983), 6 Ohio St.3d 128, 6 OBR 186, 451 N.E.2d 1193; *Manufacturer's Natl. Bank of Detroit v. Erie Cty. Rd. Comm.* (1992), 63 Ohio St.3d 318, 322, 587 N.E.2d 819, 823; and *Franks v. Lopez* (1994), 69 Ohio St.3d 345, 632 N.E.2d 502, to conclude that the alleged failure of the city to eliminate the edge drop on Roosevelt Road was potentially a failure to keep the roadway free from nuisance pursuant to the exception to immunity under R.C. 2744.02(B)(3). The trial court specifically rejected Middletown's argument that the city could be liable only for the failure to maintain the actual roadway itself, so that there could be no liability because the shoulder or berm of Roosevelt Road was not the roadway.

The trial court also found that there were issues of fact as to whether Middletown had notice of the condition, and further that there was no merit to Middletown's contention that the defense for discretionary decisions contained in R.C. 2744.03(A)(5) was applicable. The trial court determined that the city had failed to meet its burden in support of the motion and that genuine issues of material fact remained to be determined.

Middletown appealed the denial of its summary judgment motion to the Court of Appeals for Butler County, initially relying on R.C. 2744.02(C): "An order that denies a political subdivision or an employee of a political subdivision the benefit

of an alleged immunity from liability as provided in Chapter 2744. or any other provision of the law is a final order."

After the parties had briefed the appeal on the merits, Stevens filed a motion to dismiss the appeal on August 10, 1999, primarily arguing that R.C. 2744.02(C) was not retroactive to apply to a case arising from a death that occurred in 1994. Stevens also argued that the order appealed from was not a final order because it was taken from a trial court ruling on issues of fact, not of law, and further argued that the failure of the trial court to determine in its order that there was "no just reason for delay" deprived the court of appeals of jurisdiction. See Civ.R. 54(B).

Before the court of appeals ruled on that motion to dismiss, this court, on August 16, 1999, announced the decision in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062. On August 25, 1999, Stevens filed a second motion in the court of appeals to dismiss the appeal, again urging that the court of appeals was without jurisdiction to entertain Middletown's appeal. Stevens argued that because R.C. 2744.02(C) was enacted in Am.Sub.H.B. No. 350 ("H.B. 350"), and because this court's opinion in *Sheward*, at paragraph three of the syllabus, had declared H.B. 350 to be "unconstitutional in toto," there was no basis for the court of appeals to maintain jurisdiction over the appeal.

Middletown responded to Stevens's second motion to dismiss by arguing that, as an alternate ground for its appeal, the court of appeals had jurisdiction over the order pursuant to R.C. 2505.02(B)(2) as an order that affected a substantial right made in a special proceeding, or pursuant to R.C. 2505.02(B)(4) as an order that denied a provisional remedy. Middletown also argued that the lack of Civ.R. 54(B) certification by the trial court did not deprive the court of appeals of jurisdiction.

In its opinion, the court of appeals denied both of Stevens's motions to dismiss. The court of appeals found that it had jurisdiction over the appeal pursuant to R.C. 2505.02(B)(2), finding that the trial court order denying statutory immunity affected a "substantial right" and was entered in a "special proceeding," and so denied Stevens's second motion to dismiss for that reason. The court of appeals found that the underlying action was a "civil claim for wrongful death and survivorship," both of which were unknown at common law and "did not exist in law or equity prior to 1853," so that a special proceeding was involved within the meaning of R.C. 2505.02(A)(2).

The court of appeals therefore did not specifically rule on Stevens's argument, raised within her second motion to dismiss, that it had no jurisdiction pursuant to R.C. 2744.02(C) in the wake of the *Sheward* decision. Furthermore, because it

based its jurisdiction on R.C. 2505.02(B)(2), the court of appeals denied Stevens's first motion to dismiss, relating to retroactivity of R.C. 2744.02(C), as moot.

After thus finding Middletown's appeal properly before it, the court of appeals reversed the judgment of the trial court on the merits and entered summary judgment in favor of Middletown, finding that the municipality was entitled to political subdivision immunity. The court of appeals held as a matter of law that the edge drop at issue did not constitute a nuisance within the meaning of R.C. 2744.02(B)(3), so that Middletown could not be liable for an alleged failure to keep the roadway free from nuisance.

Finding its judgment on the merits issue to be in conflict with the judgment of the Fifth District Court of Appeals in *Thompson v. Muskingum Cty. Bd. of Commrs.* (Nov. 12, 1998), Muskingum App. No. CT98–0010, unreported, 1998 WL 817826, the court of appeals granted Stevens's motion to certify a conflict. The issue certified is "whether an edge drop on the berm of a county or city road, in and of itself, constitutes a nuisance within the meaning of R.C. 2744.02(B)(3)." In *Thompson,* the Fifth District Court of Appeals found that whether the edge drop between the pavement and the berm is a nuisance for purposes of R.C. 2744.02(B)(3) is a factual question, relying on *Dickerhoof,* 6 Ohio St.3d 128, 6 OBR 186, 451 N.E.2d 1193. Thus, the court of appeals in *Thompson* refused to adopt the position adopted by the court of appeals in the case *sub judice,* which is that an edge drop cannot be a "nuisance" as that term is used in R.C. 2744.02(B)(3).

Stevens also moved the court of appeals to certify a conflict on the issue of whether, in the wake of the *Sheward* decision, a court of appeals has jurisdiction pursuant to R.C. 2744.02(C) to hear an interlocutory appeal from the denial of a political subdivision's summary judgment motion based upon statutory immunity. The court of appeals declined to certify a conflict on that issue.

The cause is now before this court upon our determination that a conflict exists on the edge-drop issue (case No. 00–513), and pursuant to the allowance of a discretionary appeal (case No. 00–225).

II

Appellate Court Jurisdiction

A

Standards for Appealability

Section 3(B)(2), Article IV of the Ohio Constitution limits the appellate jurisdiction of the courts of appeals to the review of judgments and final orders of lower courts. Section 3(B)(2), Article IV provides:

"Courts of appeals shall have such jurisdiction as may be provided by law to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals within the district and shall have such appellate jurisdiction as may be provided by law to review and affirm, modify, or reverse final orders or actions of administrative officers or agencies."

The initial issue for resolution, as a prerequisite to any consideration of the merits of this case, is whether the trial court order denying Middletown's motion for summary judgment premised on immunity under R.C. Chapter 2744 was a final appealable order. If this order was not a final appealable order, the court of appeals was without jurisdiction to entertain the appeal, and should have dismissed it without reaching the merits.

The denial of a motion for summary judgment generally is considered an interlocutory order not subject to immediate appeal. See *Celebrezze v. Netzley* (1990), 51 Ohio St.3d 89, 90, 554 N.E.2d 1292, 1293–1294. See, also, *State ex rel. Overmeyer v. Walinski* (1966), 8 Ohio St.2d 23, 37 O.O.2d 358, 222 N.E.2d 312. In this case, Middletown argues that at least one exception to this general rule applies, so that the trial court order at issue was subject to an immediate appeal.

B

Appealability Pursuant to R.C. 2505.02(B)

The court of appeals in this case specifically determined that R.C. 2505.02(B)(2) provided the basis for appellate jurisdiction. Therefore, we first consider the propriety of that determination.

R.C. 2505.02(B) provides that "[a]n order is a final order that may be reviewed, affirmed, modified, or reversed, with or without retrial, when it is one of the following:

"* * *

"(2) An order that affects a substantial right made in a special proceeding * * *."

R.C. 2505.02(A)(1) defines "substantial right" as "a right that the United States Constitution, the Ohio Constitution, a statute, the common law, or a rule of procedure entitles a person to enforce or protect."

R.C. 2505.02(A)(2) defines "special proceeding" as "an action or proceeding that is specially created by statute and that prior to 1853 was not denoted as an action at law or a suit in equity."

In *Polikoff v. Adam* (1993), 67 Ohio St.3d 100, 108, 616 N.E.2d 213, 218, fn. 8, this court noted that in considering whether a particular order affected a substantial right in a special proceeding, the reviewing court's analysis first

focuses on the special proceeding portion of the inquiry. Only if it is first determined that an order was entered in a special proceeding is it necessary to go on to consider whether the order affected a substantial right.

This court held in *Polikoff*, at the syllabus, that "[o]rders that are entered in actions that were recognized at common law or in equity and were not specially created by statute are not orders entered in special proceedings pursuant to R.C. 2505.02."

In *Polikoff*, 67 Ohio St.3d at 104, 616 N.E.2d at 216, this court quoted from *Missionary Soc. of M.E. Church v. Ely* (1897), 56 Ohio St. 405, 407, 47 N.E. 537, 538: "[A]ny ordinary proceedings in a court of justice, by which a party prosecutes another for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense, involving the process and pleadings, and ending in a judgment, is an action, while every proceeding other than an action, where a remedy is sought by an original application to a court for a judgment or an order, is a special proceeding."

Furthermore, *Polikoff*, 67 Ohio St.3d at 105, 616 N.E.2d at 216, quoted *In re Estate of Wyckoff* (1957), 166 Ohio St. 354, 358, 2 O.O.2d 257, 260, 142 N.E.2d 660, 663–664, which in turn had quoted *Schuster v. Schuster* (1901), 84 Minn. 403, 407, 87 N.W. 1014, 1015, for the proposition that " ' "[w]here the law confers a right, and authorizes a special application to a court to enforce it, the proceeding is special, within the ordinary meaning of the term 'special proceedings.' " ' "

The *Polikoff* court, 67 Ohio St.3d at 105, 616 N.E.2d at 216, went on to again quote *Wyckoff*, 166 Ohio St. at 358, 2 O.O.2d at 260, 142 N.E.2d at 664, with approval: " '[T]he proceeding provided by [the statute at issue], in connection with which a petition and no other pleadings are required and wherein there is notice only, without service of summons, and which represents essentially an independent judicial inquiry, is a special proceeding.' "

In *Walters v. The Enrichment Ctr. of Wishing Well, Inc.* (1997), 78 Ohio St.3d 118, 121, 676 N.E.2d 890, 893, this court clarified the syllabus paragraph of *Polikoff*: "The determining factor of *Polikoff* is whether the 'action' was recognized at common law or in equity and not whether the 'order' was so recognized. In making the determination courts need look only at the underlying action."

For our purposes here, the key term in this statement is that the *underlying action* must be the focus of the inquiry.

The court of appeals below, in ruling that a case seeking recovery for a wrongful death is a special proceeding, did not adequately address what the true "underlying action" was in the case before it, and so reached its conclusion through an analysis that strayed from the correct focus of the inquiry. This case, although it includes claims for wrongful death and survival claims, is an ordinary

civil action seeking damages for purposes of R.C. 2505.02. The fact that a case involves an alleged wrongful death does not transform it into a special proceeding.

R.C. Chapter 2125 is commonly denominated under the heading "Action for Wrongful Death." See heading to R.C. Chapter 2125 in both Baldwin's Ohio Revised Code Annotated and Page's Ohio Revised Code Annotated. The "action" referred to in this sense is a civil action for damages. It is apparent that R.C. Chapter 2125 does not give rise to a special proceeding in the sense that that term is used in *Ely, Schuster, Wyckoff,* and *Polikoff.* R.C. Chapter 2125 does not provide for a remedy to be sought through "an original application to a court for a judgment or an order" (*Ely,* 56 Ohio St. at 407, 47 N.E. at 538), it does not authorize "a special application to a court to enforce" a right (*Schuster,* 84 Minn. at 407, 87 N.W. at 1015), and it does not provide for what is "essentially an independent judicial inquiry" (*Wyckoff,* 166 Ohio St. at 358, 2 O.O.2d at 260, 142 N.E.2d at 664).

R.C. Chapter 2125 details measures for pursuing a wrongful-death recovery within an ordinary action for money damages. R.C. 2125.01 provides that someone who causes the wrongful death of another "shall be liable to an action for damages, notwithstanding the death of the person injured." [1] This provision does not "specially create" an action or proceeding that was not recognized at common law or in equity within the meaning of *Polikoff* or of R.C. 2505.02(A)(2). Thus, it does not establish the requirements that would be necessary for a case involving a wrongful death to be a special proceeding. In the same way, no other provision within R.C. Chapter 2125 establishes the necessary requirements.

When a court considers whether a particular statute specially creates an action or proceeding that may qualify as a special proceeding for purposes of R.C. 2505.02, the court must pointedly examine the basic core of the statute at issue. The court must specifically ask whether the particular statute actually does create a special proceeding, or whether the statute merely supplies details within the structure of an ordinary action.

If an action has the characteristics of an ordinary action it does not qualify as a special proceeding. See *Polikoff,* 67 Ohio St.3d at 107, 616 N.E.2d at 218: "[Plaintiffs] sought redress of an alleged wrong by filing a lawsuit in the court of common pleas. * * * The underlying action can be distinguished from a special proceeding in that it provides for an adversarial hearing on the issues of fact and law which arise from the pleadings and which will result in a judgment for the

---

1. Am.Sub.H.B. No. 350 attempted to amend R.C. 2125.01. However, we do not identify the statute as "former," because H.B. 350 was declared unconstitutional in its entirety in *Sheward,* which had the effect of invalidating the amendment to R.C. 2125.01. See *Harp v. Cleveland Hts.* (2000), 87 Ohio St.3d 506, 509, 721 N.E.2d, 1020, 1023, fn. 1.

prevailing party." See, also, *Walters*, 78 Ohio St.3d at 122, 676 N.E.2d at 893: "In the case *sub judice*, the underlying action was an ordinary civil action, seeking damages. It was recognized at common law and hence was not a special proceeding."

As in both *Polikoff* and *Walters*, the order at issue in this case was not entered in a special proceeding. The "underlying action" is an ordinary civil suit for damages, which of course was known at common law.

Although we have focused on the consideration that the true underlying action in this case was recognized at common law, there is another aspect of R.C. 2505.02 and *Polikoff* that indicates that the trial court order in this case was not entered in a special proceeding. Both R.C. 2505.02(A)(2) and *Polikoff's* syllabus paragraph require that a special proceeding be one "specially *created* by statute." (Emphasis added.)

In *Thompson v. Wing* (1994), 70 Ohio St.3d 176, 181, 637 N.E.2d 917, 921, a majority of this court, by quoting *Griffiths v. Earl of Dudley* (1882), 9 Q.B.Div. 357, 363, seemed to accept, at least by implication, that R.C. Chapter 2125 does not " 'give any new cause of action, but only substitute[s] the right of the representative to sue in the place of the right which the deceased himself would have had if he had survived.' " See *Thompson*, 70 Ohio St.3d at 186, 637 N.E.2d at 925 (Douglas, J., concurring in judgment).

Therefore, the explicit requirement that a special proceeding be "specially created by statute" does not appear to be fulfilled in this case, as R.C. Chapter 2125 does not create a right of action for wrongful death.

Also, there is a further obstacle to a wrongful-death action being a special proceeding, separate from those discussed above. R.C. 2505.02(A)(2) requires that for a proceeding to be special, it must be one "that prior to 1853 was not denoted as an action at law or a suit in equity." Ohio's first wrongful-death statute, as this state's version of what is commonly called Lord Campbell's Act, was enacted in 1851. See 49 Ohio Laws 117. Today's wrongful-death statute contains the essential provisions of the 1851 statute.

Because a wrongful-death recovery was delineated by statute in 1851, an action for wrongful death *was* denoted as an action at law prior to 1853 for purposes of R.C. 2505.02(A)(2). Hence the precise statutory definition of special proceeding is not met for that reason.

Because we have found that there is no special proceeding at issue in this case, we need not specifically consider whether the order appealed from affected a substantial right. See *Polikoff*, 67 Ohio St.3d at 108, 616 N.E.2d at 218, fn. 8.

Having found that R.C. 2505.02(B)(2) does not confer jurisdiction on the court of appeals in this case, we further find that no other provision in R.C. 2505.02(B) supports the appeal.

For all the foregoing reasons, we hold that a trial court order entered in a civil action for damages seeking recovery for a wrongful death is not an order entered in a special proceeding for purposes of R.C. 2505.02. We reverse the judgment of the court of appeals on this issue.

Our conclusion that an order denying a motion for summary judgment in a civil action for damages involving a wrongful death is not an order entered in a special proceeding for purposes of R.C. 2505.02(B)(2) offers some consistency in an area of law that is frequently fraught with inexplicable discrepancies. It would be anomalous to hold that such an order would not be a final order in a case involving a personal injury, but would be one in a case involving a wrongful death, when the actions are so similar and are conducted procedurally in much the same manner. If a particular order is not appealable in a personal injury case, the same order should not be appealable in a wrongful-death case. We emphasize that, to qualify as a special proceeding, a particular proceeding must have the characteristics that indicate that an independent judicial inquiry is taking place. These characteristics are not present in the case *sub judice*.

## C

### Appealability Pursuant to R.C. 2744.02(C)

Because we have found that R.C. 2505.02(B) does not support appellate jurisdiction in this case, we proceed to consider whether R.C. 2744.02(C) provides an alternative ground for the court of appeals to exercise appellate jurisdiction.

### 1

### Am.Sub.H.B. No. 350 and the Ramifications of *Sheward*

Am.Sub.H.B. No. 350, 146 Ohio Laws, Part II, 3867, was signed into law by former Governor George Voinovich on October 28, 1996, and took effect on January 27, 1997. Am.Sub.H.B. No. 350 purported to amend, enact, or repeal "over one hundred sections of the Ohio Revised Code 'relative to changes in the laws pertaining to tort and other civil actions.'" See *Sheward*, 86 Ohio St.3d at 458, 715 N.E.2d at 1073, fn. 6, quoting the title of the Act. One of the purported new enactments of Am.Sub.H.B. No. 350 was R.C. 2744.02(C), which provided that "[a]n order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in Chapter 2744. or any other provision of the law is a final order." 146 Ohio Laws, Part II, 3989.

Am.Sub.H.B. No. 350 also purported to amend R.C. 2501.02 to grant jurisdiction to courts of appeals "upon an appeal upon questions of law to review, affirm, modify, set aside, or reverse judgments or final orders of courts of record inferior to the court of appeals within the district, * * * INCLUDING AN ORDER DENYING A POLITICAL SUBDIVISION OR AN EMPLOYEE OF A POLITICAL SUBDIVISION THE BENEFIT OF AN ALLEGED IMMUNITY FROM LIABILITY AS PROVIDED IN CHAPTER 2744. OR ANOTHER PROVISION OF THE REVISED CODE, for prejudicial error." *Id.* at 3982. (Am.Sub.H.B. No. 350 purported to add the phrase capitalized above to the previous version of R.C. 2501.02 in effect at that time.)

The reason we use the word "purported" in the above descriptions to refer to the legislative actions contained within Am.Sub.H.B. No. 350 is that in *Sheward,* 86 Ohio St.3d 451, 715 N.E.2d 1062, at paragraph three of the syllabus, this court held that "Am.Sub.H.B. No. 350 violates the one-subject provision of Section 15(D), Article II of the Ohio Constitution, and is unconstitutional *in toto.*" The one-subject rule holding reflected in paragraph three of the syllabus of *Sheward* was based on an "ancillary" claim raised in that case as part of relators' attempt to have Am.Sub.H.B. No. 350 declared unconstitutional in its entirety and to have its implementation enjoined. See 86 Ohio St.3d at 452, 715 N.E.2d at 1069.

In *Sheward,* this court thus struck down all legislative action contained within Am.Sub.H.B. No. 350, including the attempted enactment of R.C. 2744.02(C) and the attempted amendment of R.C. 2501.02.

After the decision in *Sheward* was announced, this court issued a series of entries in cases implicating R.C. 2744.02(C), resolving them on authority of *Sheward,* and indicating that the law regarding appealability of orders denying statutory immunity to political subdivisions and employees of political subdivisions had returned to the law that existed prior to Am.Sub.H.B. No. 350's attempt to change it. See, *e.g., Burger v. Cleveland Hts.* (1999), 87 Ohio St.3d 188, 718 N.E.2d 912; *Estate of Weitzel v. Cuyahoga Falls* (1999), 87 Ohio St.3d 200, 718 N.E.2d 921; *Braden v. Cleveland Bd. of Edn.* (1999), 87 Ohio St.3d 206, 718 N.E.2d 924; *Hubbard v. Canton City School Bd. of Edn.* (2000), 88 Ohio St.3d 14, 722 N.E.2d 1025.

2

Am.Sub.H.B. No. 215 and "Reenactment"

In one of the cases mentioned above, *Hubbard,* two justices dissented from the entry vacating the opinion of the court of appeals for lack of a final appealable order. In the *Hubbard* dissent, the following statement was made:

"Whether the judgment of the trial court denying immunity is final and appealable depends on whether R.C. 2744.02(C) was validly reenacted by the General Assembly in Am.Sub.H.B. No. 215, given that R.C. 2744.02(C) was declared unconstitutional as being part of Am.Sub.H.B. No. 350. That is, if Am.Sub.H.B. No. 215 validly reenacted this section, then the trial court's decision denying immunity to the board of education would be final, and the jurisdiction of the court of appeals would not be questioned by this court." 88 Ohio St.3d at 15, 722 N.E.2d at 1026 (Cook, J., dissenting).

Am.Sub.H.B. No. 215, effective June 30, 1997, contained an amendment to R.C. 2744.02(B)(2), which deals with the liability of political subdivisions for negligent acts by their employees with respect to proprietary functions. The sole purpose of the amendment was to insert a reference to a statute (R.C. 3314.07) that was not previously mentioned within R.C. 2744.02(B)(2). Am.Sub.H.B. No. 215 made no other changes to R.C. 2744.02.[2] 147 Ohio Laws, Part I, 1149–1150.

Section 15(D), Article II of the Ohio Constitution requires that "[n]o law shall be revived or amended unless the new act contains the entire act revived, or the section or sections amended, and the section or sections amended shall be repealed."

Consistent with this provision, Am.Sub.H.B. No. 215, in amending R.C. 2744.02(B)(2), reprinted the entire version of R.C. 2744.02 thought to be in existence at the time, including R.C. 2744.02(C) as purportedly enacted in Am.Sub.H.B. No. 350.

Middletown argues that, because Am.Sub.H.B. No. 215 amended R.C. 2744.02(B)(2) in compliance with the requirement of Section 15, Article II, the General Assembly thereby "enacted" an entirely new R.C. 2744.02 (including a new R.C. 2744.02[C] ) in Am.Sub.H.B. No. 215. Middletown argues that, because *Sheward* found Am.Sub.H.B. No. 350 unconstitutional, and therefore the version of R.C. 2744.02(C) that the bill attempted to enact unconstitutional as well, then R.C. 2744.02(C) was never truly "enacted" until Am.Sub.H.B. No. 215 enacted the statute, because everything in Am.Sub.H.B. No. 350 was a nullity.

In a related vein, Middletown argues that, pursuant to Section 15, Article II, the General Assembly's actions within Am.Sub.H.B. No. 215 should be viewed as a "repeal" in its entirety of the version of R.C. 2744.02 believed to be in effect at the time. According to this "reenactment" argument, the act therefore repealed the version of R.C. 2744.02(C) that this court found unconstitutional in *Sheward,* and replaced it with a later version of R.C. 2744.02(C) that was free of the constitutional infirmity that had caused Am.Sub.H.B. No. 350 to be struck down

---

2. Am.Sub.H.B. No. 215 made no changes to the version of R.C. 2501.02 purportedly in effect at the time after that statute's attempted amendment by Am.Sub.H.B. No. 350.

in *Sheward*. But, see, *Simmons–Harris v. Goff* (1999), 86 Ohio St.3d 1, 14–17, 711 N.E.2d 203, 214–216.

While the reenactment argument exposes an ambiguity and is plausible on its face, serious deficiencies in the argument emerge when its specifics are considered.

3

## The Intent of the General Assembly

The essential goal of statutory construction is to give effect to the intent of the General Assembly. See *Carter v. Youngstown* (1946), 146 Ohio St. 203, 32 O.O. 184, 65 N.E.2d 63, paragraph one of the syllabus. The intent may be inferred from the particular wording the General Assembly has chosen to set forth the substantive terms of a statute. See *Wachendorf v. Shaver* (1948), 149 Ohio St. 231, 36 O.O. 554, 78 N.E.2d 370, paragraph five of the syllabus. Intent may also be revealed in the procedural passage of the legislative act under consideration, when that body passes legislation that enacts, amends, or repeals a statute. See *State v. Wilson* (1997), 77 Ohio St.3d 334, 336–337, 673 N.E.2d 1347, 1350; see, also, *State ex rel. Durr v. Spiegel* (1914), 91 Ohio St. 13, 22, 109 N.E. 523, 525; *In re Hesse* (1915), 93 Ohio St. 230, 235, 112 N.E. 511, 512 (both determining intent of General Assembly by considering the way the statute at issue was amended).

Thus, for Am.Sub.H.B. No. 215 to successfully enact or reenact R.C. 2744.02(C), the General Assembly must have intended the act to have that effect. It is readily apparent that no such intent was present. At the time Am.Sub.H.B. No. 215 was passed, the General Assembly had no reason to believe that the purported enactment of R.C. 2744.02(C), attempted a short time earlier in Am.Sub.H.B. No. 350, would later be found to be unsuccessful. It is clear that while the General Assembly intended to make a minor amendment in Am.Sub. H.B. No. 215 to R.C. 2744.02(B), the General Assembly did not intend to take any action whatsoever with regard to R.C. 2744.02(C).

R.C. 101.53 (formerly 101.52, see 1998 H.B. No. 649, 147 Ohio Laws, Part III, 5043), provides:

"Bills shall be printed in the exact language in which they were passed, under the supervision of the clerk of the house in which they originated. New matter shall be indicated by capitalization and old matter omitted by striking through such matter. Prior capitalization in a Revised Code section shall be indicated by italicized type."

The editor's comment in Baldwin's Ohio Revised Code Annotated to Section 15, Article II of the Ohio Constitution makes some relevant comments regarding

R.C. 101.53, and indicates a relationship between that statute and Section 15(D), Article II:

"When amending a law or reviving a law previously repealed many legislative bodies include in the act only the desired amending language or words of revivor, which can be confusing because the language does not appear in context with the law amended or revived. The General Assembly is prohibited from this practice by division (D) of this section, which also requires that the act repeal the amended section. R.C. 101.52 (now R.C. 101.53) provides devices for showing changes in context in the printed bill or act: matter to be deleted is shown struck through, and new matter to be inserted is shown in capital letters."

The printing format of Am.Sub.H.B. No. 215 indicates no intent to reenact or enact R.C. 2744.02(C). R.C. 2744.02(C) appears in the printed act in regular type, without the capitalization that would indicate new material pursuant to R.C. 101.53.

R.C. 1.54 provides: "A statute which is reenacted or amended is intended to be a continuation of the prior statute and not a new enactment, so far as it is the same as the prior statute." In *In re Hesse,* 93 Ohio St. at 234, 112 N.E. at 512, this court stated:

"Section 16 [now Section 15(D) ], Article II of the Constitution, requires that where a law is amended, the new act shall contain the section or sections amended, and the section or sections so amended shall be repealed. In compliance with this the general assembly, when it amended [the statute at issue], did repeal the section as it existed prior thereto. It is to be remembered that the only change made in the statute was the addition of two classes of misdemeanors. The provisions contained in the act as amended which were in the original act are not considered as repealed and again reenacted, but are regarded as having been continuous and undisturbed by the amendatory act. *In re Allen* [1915], 91 Ohio St. 315 [320–321, 110 N.E. 535, 537]."

In *Weil v. Taxicabs of Cincinnati, Inc.* (1942), 139 Ohio St. 198, 206, 22 O.O. 205, 208, 39 N.E.2d 148, 152, this court stated:

"The courts have generally held, notwithstanding this [current Section 15(D), Article II] and similar constitutional provisions, that where an act is amended, the part of the original act which remains unchanged is to be considered as having continued in force as the law from the time of its original enactment, and new portions as having become the law only at the time of the amendment. Black on Interpretation of Laws (2d Ed.) 579 and 582, Sections 168 and 169; 1 Sutherland Statutory Construction (2d Ed.) 441 and 445, Sections 237 and 238; *McKibben v. Lester* [1859], 9 Ohio St. 627 [1859 WL 40]; *State ex rel. McLaughlin v. City of Newark* [1894], 57 N.J.L. 298, 30 A. 543.

"The court in the last cited case says that 'by observing the constitutional form of amending a section of a statute, the Legislature does not express an intention then to enact the whole section as amended, but only an intention then to enact the change which is indicated. Any other rule of construction would surely introduce unexpected results and work great inconvenience.'" See, also, *In re Petition to Annex 320 Acres to the Village of S. Lebanon* (1992), 64 Ohio St.3d 585, 595, 597 N.E.2d 463, 470, citing *In re Allen*, 91 Ohio St. at 320–321, 110 N.E. at 537, for the proposition that "when a statute is amended the part that remains unchanged is to be considered as having continued as the law from the time of its original enactment."

As the preceding discussion illustrates, Section 15(D), Article II sets out the form for the General Assembly to follow when amending a statute, but cases such as *Hesse, Allen,* and *Weil* explain the substantive significance of what is occurring, and give guidance for ascertaining the intent of the General Assembly when an amendment to a specific statute is contained within a particular act.

In accordance with these precedents, it is apparent that R.C. 2744.02(C) continued forward as purportedly enacted in Am.Sub.H.B. No. 350, despite Middletown's arguments based on Section 15(D), Article II. Clearly, the General Assembly did not intend to reenact R.C. 2744.02(C) in Am.Sub.H.B. No. 215. Therefore, that act neither reenacted nor enacted R.C. 2744.02(C). When this court in *Sheward* struck down Am.Sub.H.B. No. 350, it struck down the version of R.C. 2744.02(C) that Am.Sub.H.B. No. 350 attempted to enact, and R.C. 2744.02(C) remains invalid as a result of *Sheward*.

For all the foregoing reasons, we hold that R.C. 2744.02(C), as purportedly enacted in Am.Sub.H.B. No. 350, is invalid. Furthermore, R.C. 2744.02(C) was neither enacted nor reenacted by Am.Sub.H.B. No. 215. *Sheward*, 86 Ohio St.3d 451, 715 N.E.2d 1062, paragraph three of the syllabus, and *Hubbard*, 88 Ohio St.3d 14, 722 N.E.2d 1025, followed.

### III

#### Conclusion

Neither R.C. 2505.02(B) nor R.C. 2744.02(C) provided a valid basis for the court of appeals to exercise jurisdiction to entertain Middletown's appeal. Therefore, the court of appeals should have dismissed the appeal without reaching the merits of this case. Consequently, we vacate the decision of the court of appeals on the merits. See *Walters*, 78 Ohio St.3d at 123, 676 N.E.2d at 894. Since the court of appeals was without jurisdiction to reach the merits of the appeal, we

likewise may not reach the merits.[3]

Accordingly, the judgment of the court of appeals as to its jurisdiction is reversed, the judgment of the court of appeals on the merits of the appeal is vacated, and this cause is remanded to the trial court for further proceedings.

*Judgment reversed*
*and cause remanded.*

DOUGLAS, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., and LUNDBERG STRATTON, J., concur separately.

MOYER, C.J., and COOK, J., concur in part.

---

LUNDBERG STRATTON, J., concurring. I reluctantly concur with the determination in Part II C of the majority opinion that R.C. 2744.02(C) was neither enacted nor reenacted by 1997 Am.Sub.H.B. No. 215, because, based upon the format of the language of R.C. 2744.02 in H.B. 215, it was apparent that the General Assembly merely amended a section of the statute and did not enact or reenact a new law and repeal the old one. No one has disputed the General Assembly's authority to determine when issues involving immunity may be appealed. Had the majority in *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062, merely severed those sections in 1996 Am.Sub.H.B. No. 350 that violated the one-subject rule, I believe that R.C. 2744.02(C) would have remained a valid enactment.

I did not agree with the majority in *Sheward* that the bill in its entirety was unconstitutional. In particular, I expressed the opinion that even if certain provisions violated the one-subject rule of the Constitution, those offending provisions should be severed without striking the entire Act. *Id.* at 539, 715 N.E.2d at 1128 (Lundberg Stratton, J., dissenting). This case presents a perfect example of the chaos resulting from *Sheward.*

The General Assembly clearly intended to provide a political subdivision or an employee of a political subdivision the ability to immediately appeal from an order that denied the benefit of an alleged immunity from liability and enacted R.C. 2744.02(C) as part of H.B. 350. The city cites strong public policy in support of this law. Nevertheless, with no analysis of the constitutional viability of R.C. 2744.02(C) itself, the statute was struck down in *Sheward* merely because it was part of the overall tort reform bill.

---

3. *Haynes v. Franklin* (Sept. 25, 2000), Warren App. No. CA2000-03-025, unreported, 2000 WL 1371000, discretionary appeal and certified conflict allowed today, case Nos. 00-2004 and 00-2141, presents this court with an opportunity to address the edge-drop issue on the merits.

Nevertheless, I am constrained to agree that, based upon the technical requirements in the bill-making process, R.C. 2744.02(C) was neither enacted nor reenacted by H.B. 215. Therefore, I concur.

MOYER, C.J., concurs in the foregoing concurring opinion.

———

COOK, J., concurring in part. I agree with the syllabus paragraphs and with most of the majority's reasoning. I respectfully disagree, however, with two points the majority suggests and with the majority's characterization of the disposition of this case.

First, the majority states that "in considering whether a particular order affected a substantial right in a special proceeding, the reviewing court's analysis first focuses on the special proceeding portion of the inquiry. Only if it is first determined that an order was entered in a special proceeding is it necessary to go on to consider whether the order affected a substantial right." To constitute a final appealable order under R.C. 2505.02(B)(2), the order at issue must be "[a]n order that affects a substantial right" and must have been "made in a special proceeding." Given that there is no statutory basis for the sequential inquiry set forth in dicta in *Polikoff v. Adam* (1993), 67 Ohio St.3d 100, 108, 616 N.E.2d 213, 218, fn. 8, and again by the majority today, and given that the failure of either prong of the two-part inquiry would yield a resolution regarding appealability, I conclude that a reviewing court may address either the substantial right inquiry or the special proceeding inquiry first.

Second, in holding that this case involves an ordinary civil action for damages and not a special proceeding, the majority refers to the headings to R.C. Chapter 2125 contained in both Baldwin's Ohio Revised Code Annotated and Page's Ohio Revised Code Annotated. But R.C. 1.01 provides that "Title, Chapter, and section headings and marginal General Code section numbers do not constitute any part of the law as contained in the 'Revised Code.' " One member of this court has explained the character of such headings as follows:

---

*Ted L. Wills, Howard M. Schwartz* and *Marc D. Mezibov,* for appellant.

*Robert J. Gehring* and *Leslie S. Landen,* Middletown Law Director, for appellee.

*Arthur, O'Neil, Mertz & Bates Co., L.P.A.,* and *Joseph W. O'Neil,* urging reversal for *amicus curiae* Ohio Academy of Trial Lawyers.

*John E. Gotherman, Barry M. Byron* and *Stephen L. Byron,* urging affirmance for *amicus curiae* Ohio Municipal League.

*Isaac, Brant, Ledman & Teetor, Mark Landes* and *Paul A. Mackenzie,* urging affirmance for *amici curiae* County Commissioners' Association of Ohio and County Engineers' Association of Ohio.