[Cite as *State v. James*, 2024-Ohio-1469.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                   No. 112741

    v.                           :

ANTHONY JAMES,                          :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 18, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-632753-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carl J. Mazzone, and Maryann Zaky, Assistant Prosecuting Attorneys, *for appellee*.

Joseph V. Pagano, *for appellant*.

MICHAEL JOHN RYAN, J.:

{¶ 1} Defendant-appellant, Anthony James ("appellant"), appeals from his judgment of conviction, which was rendered after a jury trial. After a thorough review of the facts and pertinent law, we affirm the trial court's judgment.

**Procedural History**

{¶ 2} The charges and conviction arose from the June 2018 deadly shooting of Bahati Jumah ("Jumah"), and the robbery of Muzamil Islow ("Muzamil") and Yusuf Abdi Osman ("Osman").

{¶ 3} In October 2018, appellant was indicted along with a codefendant, Frederico Minor ("Minor"); Minor had been on postrelease control at the time of the incident. Counts 1, 2, and 3 related to the shooting of Jumah and charged aggravated murder, murder, and felonious assault, respectively. Counts 4 and 5 charged aggravated robbery of Muzamil and Osman, respectively. Counts 1 through 5 all contained one- and three-year firearm specifications. The final count of the indictment, Count 6, related solely to codefendant Minor and charged him with having weapons while under disability.

{¶ 4} After negotiations with the state, codefendant Minor pled guilty to Count 1, amended to involuntary manslaughter with a one-year firearm specification and Counts 4 and 5, the two counts of aggravated robbery, amended to delete the firearm specifications. The negotiated plea deal required Minor to testify truthfully against appellant in exchange for the state recommending a six-year sentence. Minor did testify against appellant, and the trial court followed the state's recommendation and sentenced Minor to a six-year prison term. Minor also faced additional time for violating the terms of his postrelease control on another case due to his conduct in this case.

{¶ 5} Appellant's jury trial began in April 2023. In the time between the indictment and trial — i.e., from October 2018 to April 2023 — the case was extensively pretried, in large part, because of the repeated withdrawal of counsel and appointment of new counsel that occurred at appellant's request. Appellant was represented by at least five different attorneys, who, upon being assigned, needed time to get familiarized with the case. Pretrial and trial dates were continually continued, largely at the defense's behest, because discovery and negotiations were ongoing.

{¶ 6} For a period of time, appellant waived his right to counsel and proceeded pro se with stand-by counsel; during this time, as well as when he was represented by counsel, appellant, pro se, filed a barrage of motions. For example, appellant, pro se, raised alleged speedy trial violations a number of times. In one instance, when appellant was properly proceeding pro se in February 2022 because he had voluntarily waived his right to counsel, he filed a motion to dismiss based on speedy trial. A hearing was held, it was determined that time was tolled at that time because appellant had never responded to the state's discovery request, and the motion was denied.

{¶ 7} Thereafter, in March 2022, appellant waived his speedy trial rights from March 8, 2022, through September 30, 2022. Despite his waiver, on May 2, 2022, appellant filed a "motion to assert speedy trial rights." None of his counsel ever raised the issue of speedy trial.

{¶ 8} The record further shows that, in late October 2021, appellant raised the issue of his competency and was referred to the court psychiatric clinic for evaluation. After evaluation, in early January 2022, appellant's counsel and the state stipulated to the psychiatric clinic's report, which found appellant competent.

{¶ 9} In addition to the constant change of counsel, beginning near the end of March 2020, the proceeding was at a standstill because of court orders related to the Covid-19 pandemic.[1]

{¶ 10} When the case did proceed to trial in April 2023, the state presented 16 witnesses. At the close of the state's case, appellant made a Crim.R. 29 motion for judgment of acquittal, which the trial court denied. The defense rested without presenting any witnesses and renewed its Crim.R. 29 motion; the motion was again denied. The defense requested an instruction on the lesser-included offense of involuntary manslaughter, which the trial court denied. The state requested, and was granted, a lesser included instruction on Count 1 (aggravated murder) of murder. After its deliberations, the jury returned a guilty verdict on the lesser-included offense of aggravated murder, that being murder, under Count 1, and guilty verdicts on the remaining counts and specifications of the indictment.

---

[1] We further note that in October 2021, the trial judge originally assigned to the case unexpectedly passed away and a retired judge of the court was appointed by the Ohio Supreme Court to take over the deceased judge's docket; he presided through the end of the year 2021. In 2022, the governor appointed an attorney to take over the docket; that jurist ran for election to the seat in November 2022, but was defeated. The newly elected judge took over the case in January 2023, and was the judge who presided at trial.

{¶ 11} At sentencing, the trial court merged Counts 1, 2, and 3 (murder and felonious assault of Jumah) and the state elected to sentence on Count 1, murder. The court imposed a prison term of 18 years to life on Count 1, which included three years on the firearm specification; six years on Count 4 (aggravated robbery), which included three years on the firearm specification; and six years on Count 5 (aggravated robbery), which included three years on the firearm specification. Counts 4 and 5 were ordered to be served concurrently to each other, but consecutively to the sentence imposed under Count 1. Thus, appellant was sentenced to a term of 24 years to life.

**Facts as Elicited from Trial Testimony**

{¶ 12} The trial testimony established that appellant and his codefendant Minor were known drug dealers on the west side of Cleveland. The two spent much of the day together on the day of the incident at issue and much of the relevant events occurred at a west-side apartment complex located on W. 112th Street, near Detroit Avenue, in Cleveland.

{¶ 13} Minor testified that appellant owned two semiautomatic pistols. Prior to the day of the incident, one of appellant's pistol was stolen from him — the theft occurred at this apartment complex. Also, some time prior to the incident, Minor had purchased a weapon from a maintenance man at the apartment complex. Minor showed the weapon to appellant, who, coincidentally, recognized it as his stolen weapon. Minor testified that after learning from appellant that it was the stolen gun, he too believed it was appellant's stolen weapon. Minor questioned the maintenance

man about from whom he had purchased the weapon. Minor learned a general description of the sellers and that they "hung out" at the apartment complex.

{¶ 14} On the day of the incident, Muzamil, one of the robbery victims, had an encounter with appellant; he did not know who appellant was. The encounter occurred at a convenience store across the street from the apartment complex. Muzamil described appellant as "skinny" and wearing yellow pants. Appellant said something to Muzamil to the effect of "whatever you got over there, we're going to need that." Muzamil testified that he was confused and felt threatened.

{¶ 15} Minor testified that that evening, he and appellant went to the apartment complex around 9:15 p.m. They saw the robbery victims, Muzamil and Osman, along with another individual identified only as "Rome" exit the apartment complex. Believing that one or all of them had stolen appellant's gun, appellant and Minor approached the men. Minor testified that appellant had a gun and pointed it the trio — Muzamil testified that, although he never saw a gun, appellant acted like he had one. However, Osman testified that he saw appellant with a gun. Appellant had a shirt covering his face.

{¶ 16} Muzamil and Osman testified that the "chubby" man, who was later identified as Minor, demanded whatever Muzamil had in his pocket and grabbed at his pocket in an attempt to get the contents of it. Muzamil said he did not have anything in his pocket and pushed Minor's hand away; Minor responded by punching both Muzamil and Osman. Muzamil, Osman, and Rome ran back into the apartment complex.

{¶ 17} Muzamil testified that he ran into the building to tell his friends about what had just occurred and to warn them not to go outside. Approximately 30 minutes later, Muzamil and Osman left the apartment complex. Muzamil testified that about an hour later, he received a call from his brother, Hassan Islow ("Hassan") saying that Jumah had been shot. Muzamil and Osman hurried back to the apartment complex, where they found Jumah on the floor, bleeding and choking on his own blood. The testimony revealed that the shooting occurred at approximately 10:20 p.m.

{¶ 18} Jumah had been with his brother on the evening in question — they were in an apartment at the complex and were babysitting Hassan's child. Hassan and the child's mother, Erin, lived in an adjacent building and were spending time alone.

{¶ 19} According to Jumah's brother, Jumah stepped out of the apartment for a reason unknown to him. Hassan's testimony explained why Jumah left the apartment — Jumah was coming to his apartment to use the WiFi. According to Hassan, Jumah banged on the door, stumbled in, and fell to the floor. Hassan called first responders while Erin administered CPR to Jumah. Jumah was transported to a local hospital, where he passed away. An autopsy revealed that Jumah died of a gunshot wound to the neck.

{¶ 20} Minor testified as to the shooting. He explained that after the robbery earlier in the evening, he and appellant went to his (Minor's) house on W. 73rd Street in Cleveland where they relaxed until they left to purchase liquor; Minor was

driving in his red Pontiac Grand Prix. They went to a couple of stores and were on their way to a west-side location to meet a "customer."

{¶ 21} They drove by the apartment complex, and as they did, they saw a group of people outside. Appellant told Minor to turn around because he believed it was the same group from earlier in the day. Minor complied, they both got out of the car, and walked up to the apartment complex. By the time they reached the door, nobody was there. Although Minor did not live at the complex, he had a key from a friend. Minor opened the door to the apartment building, and he and appellant went in; Minor was first and appellant, who again had his face concealed, followed behind him. There was a man in the hallway (Jumah) and Minor realized that he was not one of the men he and appellant had previously encountered. The only people in the hallway were appellant, Minor, and Jumah. Minor punched Jumah and then ran. Minor testified that as he ran away, he heard two gunshots. According to Minor, appellant had a gun, and he did not see Jumah with a gun.

{¶ 22} Minor ran to his car and appellant soon joined him. Appellant's clothes were covered in blood. Appellant told Minor he "didn't mean to do it." Minor then drove back to his house, whereupon he told appellant he was not welcome to come in. Appellant told Minor that he needed to be dropped off on the east side of Cleveland, but Minor told him he was not taking him anywhere else. Minor's girlfriend, who was at the house, gave appellant a ride.

{¶ 23} The following day, Minor saw news reports of the shooting. He met with appellant; he described appellant as appearing "shook up" and told Minor "you

know what it is." Appellant also told Minor that if they went to jail, appellant "had him." According to Minor, he and appellant never talked about the shooting and in the weeks thereafter they drifted apart.

{¶ 24} There were reports of a red Pontiac leaving the scene of the shooting. The police, on lookout for a red Pontiac, saw one and obtained the plate information; the car was registered to Minor. The police then obtained a photograph of Minor that was placed in a lineup and presented to Muzamil and Osman; both men identified Minor as the person who attempted to rob them.

{¶ 25} In August 2018, the police processed Minor's Pontiac. A white cloth with suspected blood was taken from the vehicle. The police did not swab for fingerprints or DNA.

{¶ 26} The police investigation also included reviewing security videos from the apartment complex, a nearby beverage store, funeral home, and a city camera. Some of the videos did not have accurate times and an FBI special agent who reviewed them testified that he used the video from the city camera, which had the correct times, as a benchmark for the timing on the other videos. The special agent put together a "presentation video" of what he concluded was the significant portions of the videos and that video was shown to the jury during the agent's testimony.

{¶ 27} The special agent also testified as to his investigation of social media and phone records relative to this case. His investigation showed that Minor had a cell phone number associated with appellant in his phone. Search history on

appellant's Facebook account revealed searches the day following the shooting for "Cleveland 19 News," "Channel 5 News," "News Channel 5," "Punkin Memorial Page," "Memorial Page," "Cleveland Memorial Page," and "Remembrance Page." Law enforcement testified that the memorial pages are generally about homicide victims.

{¶ 28} Over the defense's objection, the state introduced recorded calls Minor made from jail. The trial court allowed the state to use the calls so long as they were not referred to as "jail calls" to the jury; rather, they were referred to as "recorded conversations." State's exhibit No. 13 was a two-minute call from Minor to his mother while he was in jail and prior to appellant's arrest. There was a discussion on the call about appellant saying he would post bond for Minor. Minor testified he believed appellant was willing to post his bond because they were friends. Later, after that call, appellant asked Minor if he had spoken with his lawyers and what he was going to do.

{¶ 29} The state also introduced letters, state's exhibits Nos. 16 and 17, appellant sent to Minor while the two were incarcerated. Minor read both letters aloud in court and testified that based on the content of the letters, he knew appellant sent them. In both letters appellant (1) questioned Minor saying that he was "playing with his life"; (2) said he was being advised to plead to "25 to life"; (3) said his lawyers were telling him that Minor was going to "write a statement against" him; (4) said he was "loyalty over everything"; and (5) said he had seen the evidence

and it was not "sh**." Minor testified that he believed appellant was concerned he would testify against him, and appellant was warning him to keep quiet.

{¶ 30} Other evidence was admitted over the defense's objection. While prepping one of its witnesses, appellant's ex-girlfriend Roneisha (she was appellant's girlfriend at the time of the incident), the day before she was to testify, the state learned of two Facebook messages and two jail calls involving Roneisha. The state promptly sent them to defense counsel and disclosed it to the trial court the next morning. The parties engaged in extensive discussion about the evidence. The trial court ultimately found the evidence was relevant and allowed it in with redactions.

{¶ 31} The evidence was state's exhibits Nos. 24 and 25, which were calls appellant made to a friend, Mariah, instructing her to reach out to Roniesha because he wanted Roniesha's phone number. Appellant wanted to "check her [Roneisha's] temperature" because he saw her name "popped up" in discovery and he wanted to know why.

{¶ 32} Further, state's exhibits Nos. 20A and B were the Facebook messages that Mariah sent to Roniesha the same day as the above-mentioned calls. Exhibit No. 20A was a message Mariah sent to Roniesha stating that "Anthony" was looking for her. The message further stated, "Anthony James * * * wants to know what's going on with why they talking to [you] about his case." Roniesha told Mariah that there is no reason for them to talk. Mariah messaged back saying that appellant said "f*** all that what's your number."

{¶ 33} The state also presented evidence obtained from appellant's Google account that tracked his cellular device on the day of the shooting. An FBI special agent testified that appellant's cellular information was unavailable, which was possible for a variety of reasons, including that his cellular service was turned off or using an application ("app"). Another FBI special agent testified that he learned through his investigation that appellant used various voiceover IP apps and that appellant's phone was not in service as of midnight on the night of the shooting. Minor testified that he sometimes communicated with appellant via apps such as Facebook or TextNow. Law enforcement testified that Google uses GPS, WiFi, and cell signals to estimate a device's location. They were able to compare appellant's Google account device information to Minor's cellular and Google account information for the evening in question.

{¶ 34} A special agent explained that when a device communicates with a network, it reaches a cell tower but not necessarily the closest cell tower so the device can be tracked to the general area of that tower. The agent testified that although the information is not exact, it is nonetheless accurate and reliable. After analyzing both Minor and appellant's accounts and mapping out the locations, the special agent determined the devices were together throughout the evening. Specifically, at 10:20:49 p.m., appellant's device was on Detroit Road. At 10:21 p.m., Minor's device was on Detroit Road in the West 80's area. Between 10:26 p.m. and 10:29 p.m., Minor's device was recorded at the apartment complex. The agent testified that to

a reasonable degree of technological certainty the two devices were in the same location.

{¶ 35} The agent testified that after 11:00 p.m., there was no location information for appellant's device until approximately 9:18 a.m. the next morning. Likewise, there was no overnight data information for Minor's device from late on the night of the shooting until 8:48 a.m. the next morning. The next set of location data for appellant's device came the next morning from a residence in the East Cleveland area.

{¶ 36} Appellant was arrested with an iPhone that was retained by law enforcement. However, nothing was found on the phone that was directly or indirectly related to this case. A law enforcement official testified that based on his analysis of all the cell phone and social media records obtained, he concluded that appellant was not using that iPhone at the time of the incident. Or, if he was, he was also using other devices. It was determined that appellant was using a Samsung Android device to post on his account at the relevant time.

{¶ 37} Roneisha, appellant's girlfriend at the time of the incident, testified that appellant messaged her via Instagram on the day of the shooting. He first told her he was hanging out on West Boulevard playing a game. They messaged again at 5:57 p.m. and then not again until 10:58 p.m. when appellant messaged, "I really need you." Roneisha asked "why," to which appellant responded, "whist got into sum." Roneisha testified that she took his response to mean that appellant had just gotten into something. Roneisha pressed appellant about what he is trying to tell

her, and he responded, "scant say" and that he could not call her. At 11:22 p.m., appellant told Roneisha he was on W. 73rd Street and asked to come stay with her. Their message exchange ends soon after.

## Assignments of Error

I.    The trial court erred by admitting testimony and exhibits over appellant's objection in violation of Crim.R. 16 and Evid.R. 401, 402 and 403 that deprived appellant of a fair trial and due process.

II.   The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

III.  Appellant's convictions are against the manifest weight of the evidence.

IV.   Appellant's constitutional rights were violated when the charges were not dismissed for want of speedy trial.

V.    Appellant was deprived of effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Art. I. § 10 to the Ohio Constitution.

VI.   The court erred by denying the defense request for a jury instruction on involuntary manslaughter.

VII.  Appellant's sentence is contrary to law because the record does not support the imposition of consecutive sentences.

## Law and Analysis

## Evidentiary Admissions Not an Abuse of Discretion

{¶ 38} In his first assignment of error, appellant contends that, over his objection, the trial court improperly allowed certain evidence in violation of Crim.R. 16 and Evid.R. 401, 402, and 403.

{¶ 39} A trial court has broad discretion regarding the admission of evidence, and a "reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion." *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43, citing *State v. Issa*, 93 Ohio St.3d 49, 752 N.E.2d 904 (2001). The issue then is whether the trial court's admission of the contested evidence was unreasonable, arbitrary, or unconscionable. *Noling* at *id.*

{¶ 40} Appellant's Crim.R. 16 challenge vis-à-vis admitted evidence relates to Roneisha's testimony that the state learned of the day before she was to testify. Specifically, appellant challenges the admission of exhibit Nos. 20A and 20B that were screenshots of Facebook messages between Roniesha and Mariah, as well as exhibit Nos. 24 and 25, which were recorded conversations appellant made from jail to Mariah.

{¶ 41} Crim.R. 16 provides for discovery and inspection by either party in a criminal case. Specifically, Crim.R. 16(B) provides that, upon a defendant's demand for discovery, the state must permit the defendant to inspect and copy or photograph tangible objects available to it or within its possession, custody, or control and that are material to the preparation of the defense or are intended for use by the state as evidence at the trial.

{¶ 42} A trial court does not abuse its discretion in admitting undisclosed evidence that is discoverable under Crim.R. 16 unless the record demonstrates at least one of the following factors: "(1) that the prosecution's failure to disclose [the evidence] was a willful violation of Crim.R. 16, (2) that foreknowledge of the

[evidence] would have benefited the accused in the preparation of his defense, or (3) that the accused was prejudiced by admission of the [evidence]." *State v. Parson*, 6 Ohio St.3d 442, 445, 453 N.E.2d 689 (1983), syllabus.

{¶ 43} In examining the first *Parson* factor, we find that the state's failure to disclose the evidence did not constitute a willful violation of Crim.R. 16. The record demonstrates that the evidence was not made available to the state until the day before trial, and as soon it was made available to it, the state informed the defense.

{¶ 44} In examining the second *Parson* factor, appellant makes a blanket statement that the "timing of this disclosure rendered counsel unable to provide effective assistance in violation of the Sixth Amendment," but without more, we are unable to ascertain how that foreknowledge of the evidence would have benefitted appellant in the preparation of his defense. In fact, after ruling that the evidence was going to be allowed, the trial court asked counsel if he wished to speak to appellant about it, and counsel declined. Roniesha was named in discovery. Appellant knew of his conversations with Roniesha relative to this case.

{¶ 45} Under the third *Parson* factor, we find that appellant has failed to demonstrate that he was prejudiced by the admission of the evidence. Appellant mainly contends that the evidence was irrelevant. At the trial court level, he also contended that it was prejudicial because the references to "jail" in the evidence would alert the jury that he was incarcerated. However, the trial court "cured" that potential prejudice by having the state redact references to "jail." The calls were

referred to as "recorded conversations." And that he wanted to get in contact with Roniesha "to check her temperature" was relevant.

{¶ 46} Because none of the *Parson* factors were met, we conclude that the trial court did not abuse its discretion in admitting Roneisha's social media messages and calls into evidence.

{¶ 47} Regarding relevance, Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, and irrelevant evidence is inadmissible. Evid.R. 402. "[T]he question of whether evidence is relevant is ordinarily not one of law but rather one which the trial court can resolve based on common experience and logic." *State v. Lyles*, 42 Ohio St.3d 98, 99, 537 N.E.2d 221 (1989).

{¶ 48} Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." For the purpose of Evid.R. 403(A), emphasis must be placed on the word "unfair" because "'if unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable.'" *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, 820 N.E.2d 302, ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001). Thus, "'[u]nfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.'" *Crotts* at *id.*, quoting *Oberlin* at *id.*

Evidence may be unfairly prejudicial if it "'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish.'" *Crotts* at *id.*, quoting *Oberlin* at *id.* Because fairness is subjective, the determination of whether evidence is unfairly prejudicial is left to the sound discretion of the trial court. *Crotts* at ¶ 25, citing *State v. Robb*, 88 Ohio St.3d 59, 723 N.E.2d 1019 (2000).

{¶ 49} Other pieces of evidence appellant challenges relate to his interaction with codefendant Minor. First, he challenges exhibit No. 13, which was a two-minute call codefendant Minor made to his mother. At the time, Minor was in jail on this case and appellant had not yet been arrested. During the call, Minor told his mother that appellant said he would post his bond. Second, appellant challenges two letters that he sent to Minor while they both were incarcerated, exhibit Nos. 16 and 17. In both letters appellant (1) questioned Minor saying that he was "playing with his life"; (2) said he was being advised to plea to "25 to life"; (3) said his lawyers were telling him that Minor was going to "write a statement against" him; (4) said he was "loyalty over everything"; and (5) said he had seen the evidence and it was not "sh**." Minor testified that he believed appellant was concerned he would testify against him, and appellant was warning him to keep quiet.

{¶ 50} Upon review, the trial court did not abuse its discretion in allowing the two-minute call Minor made to his mother or the letters appellant sent to Minor while he and Minor were incarcerated. Collectively, the evidence was relevant because it tended to show appellant's investment in the case — and, specifically,

investment beyond concern for a friend. Rather, it tended to show that appellant was invested in protecting his own self-interests.

{¶ 51} Also relevant were the calls in which appellant instructed Mariah to reach out to his ex-girlfriend, Roniesha, who was his girlfriend at the time of the incident, because he wanted her phone number. According to the calls he made to Mariah, appellant wanted to "check her [Roniesha's] temperature" because he saw her name "popped up" in discovery and he wanted to know why. Again, this evidence was relevant because it showed appellant's investment in the case — specifically, his investment in protecting his own self-interests.

{¶ 52} The above-mentioned evidence was appellant's own statements or statements made on his behalf. It was relevant and probative. Further, the probative value of the evidence was outweighed by any prejudice. We note in particular that the state referred to the calls as "recorded conversations" rather than jail calls and redacted reference to appellant being in jail in the Facebook messages.

{¶ 53} On this record, the first assignment of error is overruled.

**Sufficient Evidence Supports the Convictions**

{¶ 54} In his second assignment of error, appellant contends that the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal.

{¶ 55} Sufficiency is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997); *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). If the state's evidence is found to have been insufficient as a matter of law, then on appeal, the court may reverse the trial court. *Thompkins*, at paragraph

three of the syllabus, citing Ohio Constitution, Article IV, Section 3(B)(3). Under this construct, the state would have failed in its burden of production, and as a matter of due process, the issue should not even have been presented to the jury. *Thompkins* at 386; *Smith* at *id.*

{¶ 56} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, an appellate court does not conduct an exhaustive review of the record, or a comparative weighing of competing evidence, or speculation as to the credibility of any witnesses. Instead, the appellate court presumptively "view[s] the evidence in a light most favorable to the prosecution." *Jenks* at *id.*

{¶ 57} Appellant first claims that the convictions are not supported by sufficient evidence because of the lack of forensic evidence, especially in light of Minor's testimony that appellant was covered in blood when he got in his car after the shooting and the police had access to the car. Forensic evidence is not a prerequisite to a murder conviction, however. *See State v. Gardner*, 8th Dist. Cuyahoga No. 111506, 2023-Ohio-307, ¶ 40. Minor identified appellant as the shooter and that identification alone was sufficient evidence as to the counts relative to Jumah. Appellant's contention that Minor's "testimony was self-serving and not

credible" is not proper grounds for a sufficiency review. We reiterate that we do not speculate on witness credibility under a sufficiency-of-the evidence review. *Jenks* at *id.*

{¶ 58} Appellant next insinuates that the evidence was insufficient to support the aggravated robbery charges relative to Muzamil and Osman because nothing was taken from them. The statute under which appellant was indicted, R.C. 2911.01(A)(1), provides that "[n]o person, *in attempting* or committing a theft offense * * * shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it." (Emphasis added.) The evidence was sufficient to establish that appellant and Minor attempted to rob Muzamil and Osman while appellant had a gun.

{¶ 59} The evidence was also sufficient to support the conviction against appellant for the fatal shooting of Jumah. Minor's testimony as follows was sufficient: (1) appellant had a gun and when they entered the apartment complex and he did not see Jumah with a gun, (2) he, appellant, and Jumah were the only three in that area, (3) he heard gunshots as he ran away, and (4) appellant followed him to his car, was covered in blood, and said, "I didn't mean to do it."

{¶ 60} We are not persuaded by appellant's contention that the identification of appellant as the shooter was faulty because Minor was the only person who identified him. The jury was afforded the opportunity to compare Minor's in-court identification of appellant with the video surveillance identifications of him.

Although the other witnesses were unable to identify appellant because he covered his face both times, he was at the apartment complex on the day in question and they were able to give a general description — exclusive of his face — of him for the jury.

{¶ 61} Other evidence presented by the state was sufficient to sustain the convictions. For example, forensic evidence from Minor's cellular and Google accounts, compared with appellant's Google account information, demonstrated that both men's devices were together throughout the day and evening in question. Further, later that evening after the fatal shooting of Jumah, appellant messaged Roniesha, his girlfriend at the time, and indicated that he had "gotten into something" that he could not talk about, and that he needed her. When he found out that Roniesha's name was mentioned in his discovery, he had Mariah contact her to "take her temperature."

{¶ 62} The state presented sufficient evidence to support the convictions; the second assignment of error is therefore overruled.

**Convictions not against the Manifest Weight of Evidence**

{¶ 63} In his third assignment of error, appellant challenges his convictions as being against the manifest weight of the evidence.

{¶ 64} Manifest weight is a question of fact. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. If the trial court's judgment is found to have been against the manifest weight of the evidence, then an appellate panel may reverse the trial court.

*Id.* Under this construct, the appellate court "sits as the 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Id.*

{¶ 65} In a manifest weight analysis, an appellate court "reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and * * * resolves conflicts in the evidence." *Id.* "A court reviewing questions of weight is not required to view the evidence in a light most favorable to the prosecution, but may consider and weigh all of the evidence produced at trial." *Id.* at 390 (Cook, J., concurring). "The weight to be given the evidence and the credibility of witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 66} An appellate court may not merely substitute its view for that of the jury but must find that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387; *see also id.* at 390 (Cook, J., concurring) (stating that the "special deference given in a manifest-weight review attaches to the conclusion reached by the trier of fact."). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶ 67} In this assignment of error is where we can consider appellant's attack of Minor's credibility. The jury heard all about his credibility issues: that he was a known drug dealer with a criminal history, that he claimed he did not use or own guns since his release from prison in April 2021, yet he purchased a gun from the

maintenance man at the apartment complex, and that the state was going to recommend a six-year sentence as part of a plea bargain for his part in this case. The jury chose to believe Minor — not an incredible result given the other evidence against appellant. That other evidence included statements appellant made or were made on his behalf and forensic digital evidence demonstrating that appellant and Minor were together for most of the day and evening in question. Included in the statements appellant made on the evening of the incident, after the shooting, were that he had "gotten into something" that he could not talk about. And included in the digital evidence were searches appellant conducted the day after the shooting to memorial pages for homicide victims.

{¶ 68} Appellant also claims in this assignment of error that the video surveillance evidence was not properly authenticated and that a proper chain of custody was not established.

{¶ 69} Evid.R. 901 provides for the authentication or identification of evidence prior to its admissibility. It provides in relevant part that "the authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). "The authentication requirement of Evid.R. 901(A) is a low threshold that does not require conclusive proof of authenticity, but only sufficient foundation evidence for the trier of fact to conclude that the evidence is what its proponent claims it to be." *State v. Toudle*, 8th Dist.

Cuyahoga No. 98609, 2013-Ohio-1548, ¶ 21, citing *Yasinow v. Yasinow*, 8th Dist. Cuyahoga No. 86467, 2006-Ohio-1355, ¶ 81.

{¶ 70} In this case, multiple witnesses testified about the video evidence, either because they were in the footage or had knowledge of what the footage purported to be. On this record, the evidence was properly authenticated.

{¶ 71} We likewise do not find a chain-of-custody issue. As a general matter, "'the state [is] not required to prove a perfect, unbroken chain of custody.'" *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 57, quoting *State v. Keene*, 81 Ohio St.3d 646, 662, 693 N.E.2d 246 (1998). "'A strict chain of custody is not always required in order for physical evidence to be admissible.'" *Id.*, quoting *State v. Wilkins*, 64 Ohio St.2d 382, 389, 415 N.E.2d 303 (1980).

{¶ 72} Here, the investigating detective obtained the video surveillance at the start of his investigation. The detective then gave the evidence to the special agent when he became involved in the investigation. The special agent testified at trial about how law enforcement came into possession of the evidence. On this record, the state established a proper chain of custody.

{¶ 73} In light of the above, this is not the exceptional case in which the evidence weighs heavily against the conviction. Appellant's third assignment of error therefore overruled.

**Appellant's Speedy Trial Rights were not Violated**

{¶ 74} In his fourth assignment of error, appellant contends that his right to a speedy trial was violated.

{¶ 75} Criminal defendants are guaranteed the right to a speedy trial under both the state and federal constitutions.  Ohio Constitution, Article I, Section 10; the Sixth Amendment to the U.S. Constitution.  "Speedy-trial provisions are mandatory, and courts must strictly enforce them." *State v. Parker*, 113 Ohio St.3d 207, 2007-Ohio-1534, 863 N.E.2d 1032, ¶ 15.

{¶ 76} Ohio has codified defendants' speedy-trial guarantees in R.C. 2945.71.  Under R.C. 2945.71(C)(2), a person charged with a felony must be tried within 270 days from arrest.  Each day that a defendant is held in jail in lieu of bond is counted as three days. R.C. 2945.71(E).  Therefore, the statute's triple-count provision requires the state to try jailed defendants within 90 days from arrest.  *State v. Henderson*, 1st Dist. Hamilton No. C-100021, 2010-Ohio-5730, ¶ 9.

{¶ 77} Under R.C. 2945.72, the time limit may be extended by certain events, however.  Relevant here, the statute provides:

> The time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following: * * * (B) Any period during which * * * the accused's mental competence to stand trial is being determined * * *; * * * (E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused; * * * (G) Any period during which trial is stayed pursuant to an express statutory requirement, or pursuant to an order of another court competent to issue such order; [or] (H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion.

R.C. 2945.72.

{¶ 78} Initially, we note that, despite appellant, pro se, raising speedy trial several times, the trial court only made one speedy trial determination because, other than the one time, it was either never raised by counsel or improperly raised by appellant when he was represented by counsel and his counsel never joined in his motions. Criminal defendants are not entitled to "hybrid" representation. That is, defendants represented by counsel may not act simultaneously as their own counsel. *State v. Ojile*, 1st Dist. Hamilton No. C-200340, 2021-Ohio-2955, ¶ 9. Therefore, other than one challenge when appellant was properly proceeding pro se, he had no right to file motions to dismiss and the trial court was prohibited from entertaining them. *State v. Castagnola*, 9th Dist. Summit Nos. 28621, 28672, and 28702, 2018-Ohio-1604, ¶ 14.

{¶ 79} We find no merit to the one properly raised challenge. The delay in this case was overwhelmingly attributed to appellant's constant change of counsel, which then necessitated new counsel getting "up to speed" on the case. Further, appellant's pro se motions qualified as tolling events under R.C. 2945.72(E) for purposes of calculating speedy trial time. *See State v. Miller*, 9th Dist. Lorain No. 10CA009922, 10CA009915, 2012-Ohio-1263, ¶ 13. This is so, because absent at least a cursory review of the pro se motion, it would not be possible to determine whether defense counsel joined in the motion or indicated some need for the relief the defendant sought. *State v. Davis*, 10th Dist. Franklin No. 05AP-193, 2006-Ohio-5039, ¶ 12. Moreover, the case was tolled for a period of time pursuant to the common pleas court's administrative orders in dealing with the Covid-19 pandemic.

*See State v. Tuttle*, 8th Dist. Cuyahoga No. 110508, 2022-Ohio-303, ¶ 31; *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 92; *State v. Quinn*, 8th Dist. Cuyahoga No. 110692, 2022-Ohio-2038, ¶ 36, and *In re C.C.*, 2022-Ohio-2264, 192 N.E.3d 1203, ¶ 37 (8th Dist.). The case was also tolled because of appellant's failure to respond to the state's discovery request.

{¶ 80} On this record, we find no violation of appellant's right to a speedy trial. The fourth assignment of error is overruled.

**Trial Counsel was not Ineffective**

{¶ 81} For his fifth assigned error, appellant contends that his trial counsel was ineffective by not objecting to certain trial testimony and not objecting to the video evidence.

{¶ 82} In order to establish a claim of ineffective assistance of counsel, the applicant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989); *State v. Reed*, 74 Ohio St.3d 534, 660 N.E.2d 456 (1996).

{¶ 83} First, appellant contends that counsel was ineffective for not objecting to hearsay testimony elicited from Minor; specifically, testimony about the firearm he purchased from the maintenance man. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). In general, hearsay is not admissible. Evid.R. 802.

{¶ 84} A careful review of the testimony regarding Minor's purchase of appellant's stolen gun from the maintenance man does not reveal hearsay testimony. The relevant testimony was as follows:

[Assistant prosecutor]: After [appellant] told you that that was his gun, did it then look familiar?

[Minor]: Yes.

[Assistant prosecutor]: Now, did you ask the maintenance man where he got it from?

[Minor]: Yes.

[Assistant prosecutor]: Did you relay what the maintenance man told you to appellant?

[Minor]: Yes.

[Assistant prosecutor]: Okay. So based on what [appellant] learned from you, did you guys talk about the theft of this gun?

[Minor]: Yes.

Tr. 721.

{¶ 85} The record demonstrates that Minor did not testify as to what the maintenance man told him about the stolen gun. Thus, counsel was not ineffective for not objecting to the testimony — it was not hearsay testimony.

{¶ 86} Second, appellant contends that because there were issues with authentication and chain of custody with the video evidence, had counsel objected, it most likely would not have been admitted. For the reasons already discussed, there was sufficient evidence to authenticate the evidence and establish its chain of custody. As such, counsel was not ineffective for not objecting to it.

{¶ 87} The fifth assignment of error is overruled.

## Denial of Involuntary Manslaughter Jury Instruction was not an Abuse of Discretion

{¶ 88} In appellant's sixth assignment of error, he contends that the trial court abused its discretion by denying his request for an involuntary manslaughter instruction.

{¶ 89} Trial courts have broad discretion in determining whether the evidence adduced at trial was sufficient to warrant a jury instruction. *State v. Morris*, 5th Dist. Guernsey No. 03CA29, 2004-Ohio-6988, ¶ 55, *rev'd on other grounds*, 109 Ohio St.3d 313, 2006-Ohio-2109, 847 N.E.2d 1174; *State v. Mitts*, 81 Ohio St.3d 223, 228, 690 N.E.2d 522 (1998). "When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction constituted an abuse of discretion under the facts and circumstances of the case." *State v. Sims*, 8th Dist. Cuyahoga No. 85608, 2005-Ohio-5846, ¶ 12, citing *State v. Wolons*, 44 Ohio St.3d 64, 541 N.E.2d 443 (1989). A trial court does not abuse its discretion by not giving a jury instruction if the evidence is insufficient to warrant the requested instruction. *State v. Lessin*, 67 Ohio St.3d 487, 494, 620 N.E.2d 72 (1993).

{¶ 90} The Ohio Supreme Court has stated the following relative to instructing a jury on a lesser included offense:

> A criminal defendant is entitled to a lesser-included-offense instruction [ ] only where the evidence warrants it. Thus, the trial court's task is two fold: first, it must determine what constitutes a lesser included offense of the charged crime; second, it must examine the facts and

ascertain whether the jury could reasonably conclude that the evidence supports a conviction for the lesser offense and not the greater.

(Citations omitted.) *State v. Kidder*, 32 Ohio St.3d 279, 280, 513 N.E.2d 311 (1987).

{¶ 91} Involuntary manslaughter is a lesser included offense of aggravated murder. *State v. Thomas*, 40 Ohio St.3d 213, 215, 533 N.E.2d 286 (1988). Thus, we consider the second step for determining whether an involuntary manslaughter instruction should have been provided, that is, whether the evidence not only supported an acquittal on the initial crime, but also supported a conviction on the lesser included offense. An instruction on a lesser included offense is not required simply because some evidence of a lesser included offense is advanced. *State v. Hill*, 8th Dist. Cuyahoga No. 87645, 2006-Ohio-6425, ¶ 32.

{¶ 92} No testimony or evidence presented at trial supported an involuntary manslaughter instruction. Appellant's defense at trial was that Minor was lying and appellant was not involved or present on the scene for either the aggravated robberies or the deadly shooting. Appellant's defense that he was not even present at the scene for the crimes undercuts his request for an involuntary manslaughter instruction. *See, e.g., State v. Smith*, 8th Dist. Cuyahoga No. 100204, 2014-Ohio-2057, ¶ 56 (Counsel was not ineffective for not requesting a lesser-included instruction because the defendant's theory of the case was that he acted in defense of himself and another, which counsel could have logically decided was inconsistent with requesting a jury instruction on aggravated assault.).

{¶ 93} The sixth assignment of error is overruled.

**The Record Supports the Imposition of Consecutive Sentences**

{¶ 94} In his final assignment of error, appellant contends that that record does not support the trial court's findings for the imposition of consecutive sentences.

{¶ 95} Under R.C. 2929.14(C)(4), a trial court may order prison terms to be served consecutively if it finds "the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." Further, the court must also find any of the following:

> The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4).

{¶ 96} There are two ways a defendant can challenge consecutive sentences on appeal. First, the defendant can argue that consecutive sentences are contrary to law because the court failed to make the findings required by R.C. 2929.14(C)(4).

*See* R.C. 2953.08(G)(2)(b); *State v. Reindl,* 8th Dist. Cuyahoga Nos. 109806, 109807, and 109808, 2021-Ohio-2586, ¶ 13; *State v. Nia,* 2014-Ohio-2527, 15 N.E.3d 892, ¶ 16 (8th Dist.). Second, the defendant can argue that the record "clearly and convincingly" does not support the court's findings made pursuant to R.C. 2929.14(C)(4). *See* R.C. 2953.08(G)(2)(a); *Reindl* at *id.*

{¶ 97} Appellant does not contend that the trial court did not make the required statutory findings and our review demonstrates that the court in fact did. Rather, appellant argues that the record does not support the findings. In addressing this assignment of error, we review the record and consider whether it does not support the trial court's consecutive-sentence findings. *State v. Trujillo,* 8th Dist. Cuyahoga No. 112442, 2023-Ohio-4125, citing *State v. Gwynne,* Slip Opinion No. 2023-Ohio-3851, ¶ 5.

{¶ 98} Upon review, we are not able to say that the record "clearly and convincingly" does not support the court's findings. The record demonstrates, as found by the trial court, that the robberies and murder were committed as part of a course of conduct and the harm caused by the crimes was so great or unusual that no single prison term for the offenses would adequately reflect the seriousness of appellant's conduct.

{¶ 99} The seventh assignment of error is overruled.

{¶ 100} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

EILEEN A. GALLAGHER, P.J., and
MARY J. BOYLE, J., CONCUR